[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 16 , 2009
THOMAS K. KAHN
CLERK

No. 08-16009

IN RE:

TROY ANTHONY DAVIS,

Petitioner.

Application for Leave to File a Second or Successive
Habeas Corpus Petition, 28 U.S.C. § 2244(b)

(April 16, 2009)

Before DUBINA, BARKETT and MARCUS, Circuit Judges.

PER CURIAM:

On October 22, 2008, Troy Anthony Davis ("Davis"), a Georgia death row

inmate, filed an application with this Court seeking authorization to file a second

or successive 28 U.S.C. § 2254 federal habeas petition, raising for the first time a

freestanding actual innocence claim. Davis had previously filed a federal habeas petition in the United States District Court for the Southern District of Georgia in 2001, alleging, among other things, violations of *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972), *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), and *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). Davis now claims that his execution would violate the Eighth and Fourteenth Amendments because he is actually innocent of the offense of murder. We took the unusual step of staying Davis's execution, which had been scheduled for October 27, 2008, and ordered the parties to submit further briefs. Thereafter, we scheduled the case for oral argument. Having the benefit of the parties' briefs and after hearing extensive oral argument, we deny Davis's application.

## I. RELEVANT PROCEDURAL HISTORY

A Georgia jury convicted Davis for the murder of Savannah police officer Mark Allen MacPhail in the early morning hours of August 19, 1989, and for two other offenses. The trial court sentenced him to death for the murder conviction. The Supreme Court of Georgia affirmed Davis's convictions and death sentence. *Davis v. State*, 263 Ga. 5, 426 S.E.2d 844, *cert. denied*, 510 U.S. 950, 114 S. Ct. 396 (1993). Thereafter, in 1997, the state trial court denied his state habeas corpus petition for relief, and in 2000, the Supreme Court of Georgia affirmed the denial

2

of Davis's petition. *Davis v. Turpin*, 273 Ga. 244, 539 S.E.2d 129 (2000), *cert. denied*, 534 U.S. 842, 122 S. Ct. 100 (2001). Davis then filed his first federal habeas corpus petition on December 14, 2001, raising a number of constitutional violations, including: (1) that the prosecution knowingly presented false testimony at his trial, in violation of *Giglio*; (2) that the prosecution failed to disclose material exculpatory evidence, in violation of *Brady*; and (3) that his trial counsel was constitutionally ineffective, in violation of *Strickland*. Because Davis failed to raise these constitutional claims before the state court, he sought to overcome his procedural default of these claims by showing under *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995), that he should be able to raise these claims anyway because he was actually innocent of the underlying murder.[1] The district court did not rule on his actual innocence claim, instead reaching the merits of his constitutional claims and denying his petition.

Notably, Davis did not raise a substantive freestanding claim of actual innocence in his first federal habeas petition. During the proceedings, however, Davis moved the district court to stay the federal habeas proceedings in order for

---

[1] In *Schlup*, the Supreme Court held that a petitioner who makes the requisite showing of actual innocence may be able to obtain federal review of any constitutional claim that would otherwise be defaulted because the petitioner failed to raise that claim in state court. 513 U.S. at 314-17, 115 S. Ct. at 861-62.

him to present a freestanding actual innocence claim to the state courts. In April 2004, the district court denied Davis's stay request.

After the district court denied Davis's habeas corpus petition, we affirmed. *Davis v. Terry*, 465 F.3d 1249, 1256 (11th Cir. 2006), *cert. denied*, 127 S. Ct. 3010 (2007). We held that Davis failed to sustain a *Brady* or *Giglio* violation, and he did not establish a violation of the Sixth Amendment right to the effective assistance of counsel. And we made clear in our opinion that Davis had "not ma[d]e a substantive claim of actual innocence." *Id.* at 1251.

In 2007, the state trial court set a new execution date. Soon thereafter, Davis filed an extraordinary motion for new trial, presenting newly discovered evidence in support of his motion. *See* Ga. Code Ann. § 5-5-41 (1995 & Supp. 2008); *Dick v. State*, 248 Ga. 898, 899, 287 S.E.2d 11, 13 (1982) (indicating that affidavits in support of an extraordinary motion for new trial include "*facts* sufficient to authorize that the motion be granted if the facts developed at the hearing warrant such relief"); *Timberlake v. State*, 246 Ga. 488, 491, 271 S.E.2d 792, 795–96 (1980) (indicating that newly discovered evidence must be so material that it probably would result in a different verdict). This evidence consisted of: (1) seven affidavits containing recantations of eyewitnesses who testified at trial; (2) three affidavits averring post-trial confessions to the murder

4

by another man, Sylvester "Red" Coles (hereinafter "Red Coles"); (3) several affidavits of persons who had not previously testified who were either present at the scene of the murder or in the general area immediately following the crime; (4) two expert affidavits addressing ballistic evidence and eyewitness identifications; (5) affidavits of jurors; and (6) a general cache of additional affidavits.

Based on this evidence, Davis claimed that to apply Georgia's procedures for an extraordinary motion for a new trial in a manner that allows for his execution would be unconstitutional. The state trial court "exhaustively reviewed each submitted affidavit and considered in great detail the relevant trial testimony, if any, corresponding to each." *State v. Davis*, No. CR89-2467-FR, at 3 (Ga. Super. Ct. July 13, 2007). It observed that the majority of the affidavits that Davis submitted had been sworn over five years earlier, and a few had been attested to over ten years earlier. The state trial court concluded that some of the affidavits contained inadmissible hearsay, that the post-trial affidavits by some of the State's witnesses did not constitute cause for a new trial, and that several affidavits were not so material that they would have produced a different result. The state court ultimately denied the motion.

Davis then filed an application for discretionary appeal and a motion for a stay of execution in the Supreme Court of Georgia. While the application was

pending, Georgia's State Board of Pardons and Paroles granted a temporary stay of execution and scheduled its own hearing. *See* Ga. Code Ann. §§ 42-9-39(d) (1997 & Supp. 2008) (granting Georgia's State Board of Pardons and Paroles "authority to pardon any person convicted of a crime who is subsequently determined to be innocent of said crime"); § 42-9-42(a) (requiring majority vote of Georgia's State Board of Pardons and Paroles for a grant of clemency, pardon, parole, or other relief from sentence). The Supreme Court of Georgia dismissed Davis's motion for stay of execution as moot and granted his application for discretionary appeal. *Davis v. State*, 282 Ga. 368, 368, 651 S.E.2d 10, 10 (2007).

Thereafter, in a comprehensive opinion, the Supreme Court of Georgia affirmed the trial court's order denying Davis's extraordinary motion for new trial. *Davis v. State*, 283 Ga. 438, 660 S.E.2d 354 (2008). In affirming, the supreme court began by noting the lack of credibility that is generally afforded to recantation testimony, explaining that "[t]rial testimony is closer in time to the crimes, when memories are more trustworthy[, and] . . . the trial process itself, including public oaths, cross-examination, and the superintendence of a trial judge, lends special credibility to trial testimony." *Id.* at 441, 660 S.E.2d at 358. The supreme court nonetheless painstakingly detailed each of the seven post-trial affidavits by the State's eyewitnesses, as well as six affidavits from additional

6

witnesses Davis located, and explained how each affidavit failed to support Davis's extraordinary motion for a new trial. *Id.* at 441-47, 660 S.E.2d at 358-63. Among these affidavits were three eyewitnesses who had identified Davis at trial as the officer's shooter, and who Davis claimed had recanted their trial testimony: Antoine Williams, Dorothy Ferrell, and Harriet Murray. After detailing these post-trial affidavits, among others, the supreme court pointed to several defects in them, including the fact that Williams's and Ferrell's affidavits failed to affirmatively claim that Davis was not guilty, and that Murray's unsworn affidavit was yet another inconsistent statement she had made years after the murder. The supreme court determined that none of the affidavits had the materiality required to support an extraordinary motion for a new trial.

The Supreme Court of Georgia concluded this way:

Particularly in this death penalty case where a man might soon be executed, we have endeavored to look beyond bare legal principles that might otherwise be controlling to the core question of whether a jury presented with Davis's allegedly-new testimony would probably find him not guilty or give him a sentence other than death. In that spirit, we have chosen to focus primarily on one of the required showings for an extraordinary motion for new trial, the requirement that the new evidence be "so material that it would probably produce a different verdict." In weighing this new evidence, we do not ignore the testimony presented at trial, and, in fact, we favor that original testimony over the new. At least one original witness has never recanted his in-court identification of Davis as the shooter, which included a description of his clothing and the location he was in when

7

he struck Larry Young. As we have noted above, most of the witnesses to the crime who have allegedly recanted have merely stated that they now do not feel able to identify the shooter. At trial, the jury had the benefit of hearing from witnesses and investigators close to the time of the murder, including both Davis and Coles claiming the other was guilty. We simply cannot disregard the jury's verdict in this case.

*Id.* at 447, 660 S.E.2d at 362-63 (citations omitted).

Following the Supreme Court of Georgia's opinion, Georgia's State Board of Pardons and Paroles ("the Board") rescinded its stay of execution and denied Davis's application.[2] In so doing, the Board took the unusual step of issuing a "Statement," and noted that while it "does not generally comment on death cases it has considered for clemency[, because] the Troy Davis case . . . received such extensive publicity . . . the Board . . . decided to make an exception."[3] The Board explained that it had spent a year studying and considering the case; the Board gave Davis's attorneys an opportunity to present every witness they desired to support their allegation that there was doubt as to Davis's guilt, and the Board heard each of these witnesses and questioned them closely; the Board studied the voluminous trial transcript, the police investigation report, and the initial

---

[2] Georgia's State Board of Pardons and Paroles, State of Georgia, Denial of Commutation and Stay of Sentence of Death (Sept. 12, 2008).

[3] Georgia's State Board of Pardons and Paroles, State of Georgia, Statement Regarding Troy Davis Case (Sept. 28, 2008).

8

statements of all the witnesses; the Board had certain physical evidence retested and Davis interviewed; and "[a]fter an exhaustive review of all available information regarding the Troy Davis case and after considering all possible reasons for granting clemency, the Board . . . determined that clemency is not warranted."

Thereafter, Davis petitioned the United States Supreme Court for certiorari review of the Supreme Court of Georgia's decision. The Supreme Court initially granted a stay of execution, *Davis v. Georgia*, 129 S. Ct. 28 (2008), but several weeks later, on October 14, 2008, it denied the petition, thereby terminating the stay, *Davis v. Georgia*, 129 S. Ct. 397 (2008). Davis then began the process in this Court for permission to file a second or successive federal habeas corpus petition.

## II. DISCUSSION

Under the controlling statute, 28 U.S.C. § 2244(b)(2), a state prisoner may raise a new claim in a second or successive habeas petition in federal district court *only* if a three-judge panel of a United States Court of Appeals first determines that the application makes a prima facie showing that: (A) the petitioner's claim "relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or (B) it relies on

facts that (i) could not have been discovered previously through the exercise of due diligence, and that (ii), if proven, would "establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(A)–(B) (2006). A "prima facie showing" of these requirements is "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997) (cited in *In re Holladay*, 331 F.3d 1169, 1173–74 (11th Cir. 2003)); *Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001). After painstaking review of this case, we conclude that Davis has completely failed to meet the procedural requirements of § 2244(b)(2), and, therefore, we are constrained to reject Davis's application to file a second or successive habeas petition in the district court.

We begin by observing that it is not clear at all under the case law whether the claim that Davis now raises — a freestanding actual innocence claim — is viable on federal habeas corpus review. In *Herrera v. Collins*, 506 U.S. 390, 417, 113 S. Ct. 853, 869 (1993), the Supreme Court assumed "for the sake of argument in deciding [the] case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant

10

unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."[4] We likewise have recognized the possibility of freestanding actual innocence claims, *see Felker v. Turpin*, 83 F.3d 1303, 1312 (11th Cir. 1996), *cert. granted*, 517 U.S. 1182, 116 S. Ct. 1588 (1996), *and cert. dismissed*, 518 U.S. 651, 116 S. Ct. 2333 (1996) ("[*Herrera*] left open the difficult question of whether federal habeas courts may entertain convincing claims of actual innocence."), but have also recognized that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding," *Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002) (quoting *Herrera*, 506 U.S. at 400, 113 S. Ct. at 860). In any event, for purposes of the instant application, we need not address whether a

---

[4] *See also id*. at 419-21, 113 S. Ct. at 870-71 (O'Connor, J., concurring) ("[T]he execution of a legally and factually innocent person would be a constitutionally intolerable event," but resolving this issue is "neither necessary nor advisable in this case," where the petitioner is "not innocent."); *id*. at 428, 113 S. Ct. at 875 (Scalia, J., concurring) ("I nonetheless join the entirety of the Court's opinion, . . . because there is no legal error in deciding a case by assuming, *arguendo*, that an asserted constitutional right exists. . . ."); *id*. at 429, 113 S. Ct. at 875 (White, J., concurring) ("I assume that a persuasive showing of 'actual innocence' made after trial, even though made after the expiration of the time provided by law for the presentation of newly discovered evidence, would render unconstitutional the execution of petitioner in this case."); *id*. at 437, 113 S. Ct. at 879 (Blackmon, J., dissenting in part) (Because "[e]xecution of an innocent person is the ultimate 'arbitrary imposition' . . . from which one never recovers and for which one can never be compensated[,] . . . petitioner may raise a substantive due process challenge to his punishment on the ground that he is actually innocent.") (internal citations and brackets omitted).

petitioner can bring a freestanding actual innocence claim as described in *Herrera* in his first federal habeas petition. That question is not before us because Davis did not bring an actual innocence claim pursuant to *Herrera* in his first federal habeas petition. Rather, the only question we face is whether Davis can bring such a claim in a second or successive petition. Because it is undisputed that Davis's current application does not rely on a new rule of constitutional law as provided for under § 2244(b)(2)(A), Davis must satisfy the two procedural requirements embodied in § 2244(b)(2)(B) in order to bring a *Herrera* claim now. He has failed to meet either requirement.

Congress enacted section 2244(b)(2)(B), as it now stands, as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Plainly the statute was designed, among other reasons, to bring some finality and certainty to the seemingly never-ending collateral attack process. According to the legislative history, AEDPA's focus was to eliminate both the delay that habeas filings cause in a case and the filing of frivolous habeas claims. *See, e.g.*, H.R. Conf. Rep. No. 104-518, at 111 (1996), *reprinted in* 1996 U.S.C.C.A.N. 944, 944. Indeed, a common theme throughout the congressional debates was the desire to prevent habeas petitioners from having successive "bites at the apple." *See* 141 Cong. Rec. S7803, S7877 (1995) (statement of Sen. Dole) ("By imposing filing deadlines on

all death row inmates, and by limiting condemned killers convicted in State or Federal court to one Federal habeas petition — one bite of the apple — these landmark reforms will go a long, long way to streamline the lengthy appeals process . . . ."); 141 Cong. Rec. S16892, S16913 (1995) (statement of Sen. Feinstein) ("[T]his bill provides habeas petitioners with 'one bite at the apple.' It assures that no one convicted of a capital crime will be barred from seeking habeas relief in Federal court[.]"); 141 Cong. Rec. S7803, S7809 (1995) (statement of Sen. Kennedy) ("The proposal to limit inmates to one bite at the apple is sound in principle."); 141 Cong. Rec. S7803, S7832 (1995) (statement of Sen. Biden) ("The vast majority of us . . . want to and have been trying for years to change the old system to limit the time in which a petition can be filed and to limit the number of petitions that can be filed. So essentially you get one bite out of the apple.").

In fact, the codification of § 2244(b)(2)(B) played an important role in achieving this goal by "restrict[ing] the filing of repetitive petitions by requiring that any second petition be approved for filing in the district court by the court of appeals." 141 Cong. Rec. S7596, S7597 (1995) (statement of Sen. Hatch). It also did so by "codify[ing] some of the pre-existing [judicial] limits on successive petitions," *Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 2340 (1996) — in which successive petitioners had to show either "cause for failing to raise [the

13

claims in the earlier petition] and prejudice therefrom," or "that a fundamental miscarriage of justice would result from a failure to entertain the claim," *McCleskey v. Zant*, 499 U.S. 467, 494-95, 111 S. Ct. 1454, 1470 (1991). Notably, § 2244(b)(2)(B) tightened these limits by requiring successive petitioners to show *both* "cause" — or diligence — *as well as* "a fundamental miscarriage of justice" — or actual innocence.[5] In addition, § 2244(b)(2)(B) also requires successive petitioners to establish actual innocence by "clear and convincing evidence," a far more demanding showing than that found in previous Supreme Court cases, which had required only a "more likely than not" standard. *Schlup*, 513 U.S. at 327, 115 S. Ct. at 867.

Following the enactment of AEDPA, the Supreme Court had occasion to consider the constitutionality of the newly added gatekeeping requirements found in § 2244(b). *Felker*, 518 U.S. 651, 116 S. Ct. 2333. In *Felker*, the Supreme Court recognized that AEDPA prevented the Court from reviewing a Court of Appeals order denying leave to file a second habeas petition. *Id.* at 658–59, 116 S.

---

[5] Indeed, "cause" in the pre-AEDPA case law was "based on the principle that petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." *Id.* at 498, 111 S. Ct. at 1472. Furthermore, a "fundamental miscarriage of justice" was satisfied by a petitioner presenting "new facts [that] raise[] sufficient doubt about [petitioner's] guilt to undermine confidence in the result of the trial." *Schlup*, 513 U.S. at 317, 115 S. Ct. at 862; *see also id.* at 327, 115 S. Ct. at 867 ("To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.").

Ct. at 2337. *Felker* held, however, that the Supreme Court was not deprived of

appellate jurisdiction because AEDPA did not remove the Court's authority to

entertain an *original* petition for habeas corpus. *Id.* at 660, 116 S. Ct. at 2338.

The Supreme Court then held that AEDPA did not violate the Suspension Clause

of the Constitution — which provides that "[t]he Privilege of the Writ of Habeas

Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the

public Safety may require it," U.S. Const. art. I, § 9, cl. 2 — reasoning that:

> The writ of habeas corpus known to the Framers was quite different from that which exists today. As we explained previously, the first Congress made the writ of habeas corpus available only to prisoners confined under the authority of the United States, not under state authority. The class of judicial actions reviewable by the writ was more restricted as well. . . .

> It was not until 1867 that Congress made the writ generally available in "all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States." And it was not until well into this century that this Court interpreted that provision to allow a final judgment of conviction in a state court to be collaterally attacked on habeas. But we assume, for purposes of decision here, that the Suspension Clause of the Constitution refers to the writ as it exists today, rather than as it existed in 1789.

> The Act requires a habeas petitioner to obtain leave from the court of appeals before filing a second habeas petition in the district court. But this requirement simply transfers from the district court to the court of appeals a screening function which would previously have been performed by the district court as required by 28 U.S.C. § 2254 Rule 9(b). The Act also codifies some of the pre-existing limits

15

on successive petitions, and further restricts the availability of relief to habeas petitioners. But we have long recognized that "the power to award the writ by any of the courts of the United States, must be given by written law," and we have likewise recognized that *judgments about the proper scope of the writ are "normally for Congress to make*."

*Id.* at 663-64, 116 S. Ct. at 2339-40 (citations omitted and emphasis added). The Supreme Court concluded that the new restrictions found in § 2244(b) fell well within congressional authority and did not violate the Constitution. *Id.* at 664, 116 S. Ct. at 2340.

With this in mind, we turn to fulfilling the gatekeeping function Congress has laid out for us in § 2244(b).

A. *28 U.S.C. § 2244(b)(2)(B)(i)*

We must consider whether Davis has made a prima facie showing establishing the first requirement found in § 2244(b)(2)(B) — that is, whether "the factual predicate for" his *Herrera* claim "could not have been discovered previously through the exercise of due diligence." 28 U.S.C. § 2244(b)(2)(B)(i). "What matters under § 2244(b)(2)(B)(i) is whether [Davis], with the exercise of due diligence, could have discovered [the facts he now presents to us] at the time he filed his first federal habeas petition." *See Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351, 1359 (11th Cir.), *cert. denied*, 128 S. Ct. 450 (2007). Because Davis

16

freely admits that virtually every piece of evidence underlying his *Herrera* claim "was discovered before or during Mr. Davis's first federal habeas proceedings and was submitted to the federal habeas court for consideration [of the other claims he brought in that petition]," Davis Br. 10, he does not argue that this evidence could not have been discovered previously through due diligence. Rather, he attempts to skirt the due diligence requirement in a variety of ways.

First, Davis suggests that he was diligent in gathering the "new" evidence underlying his *Herrera* claim because he brought this very evidence to the first federal habeas court. The problem with this argument, however, is that he did not present evidence of actual innocence to the district court in support of a *Herrera* freestanding actual innocence claim. Rather, he used this evidence only to argue that, under *Schlup*, he could overcome the procedural default of the other constitutional claims he sought to pursue. These defaulted constitutional claims included a *Brady* violation, a *Giglio* violation, and an ineffective-assistance-of-counsel claim, but, significantly, did not include a *Herrera* claim. *See Davis*, 465 F.3d at 1251-53. He cannot now argue that by simply presenting the underlying evidence in his first federal habeas petition in support of wholly different constitutional claims — without any accompanying *Herrera* claim — he has satisfied the due diligence prong of the statute.

17

Plainly, the statute does not support this argument. As the statute reads, a claim brought in a successive petition must be dismissed unless "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence." 28 U.S.C. § 2244(b)(2)(B)(i). Davis concedes that almost all of the factual predicate for his claim *could have been* discovered previously, and in fact, *was* discovered previously. Davis possessed the "factual predicate" for his *Herrera* "claim" during his first federal habeas corpus proceeding, and could have presented the claim, but chose not to do so. *See Jordan*, 485 F.3d at 1359 (concluding that petitioner failed to satisfy § 2244(b)(2)(B)(i) because he actually knew of the factual predicate of his claim when he filed his first § 2254 petition); *In re Bryan*, 244 F.3d 803, 805 (11th Cir. 2000) (concluding that the petitioner failed to satisfy § 2244(b)(2)(B)(i) because he did not explain why a diligent investigation could not have uncovered the factual predicate of his claim); *In re Magwood*, 113 F.3d 1544, 1548 (11th Cir. 1997) (same); *In re Boshears*, 110 F.3d 1538, 1543 (11th Cir. 1997) (denying petitioner's application for leave to file a second habeas petition in a non-capital case because the evidence petitioner presented to prove his innocence was readily available to him when he litigated his first habeas petition).

Davis also maintains that even though he had all the necessary evidence, he could not have brought a *Herrera* freestanding actual innocence claim in his first federal habeas petition because he had not exhausted his state remedies. This argument is foreclosed by Supreme Court precedent, beginning with *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198 (1982), in which the plurality opinion held that district courts should dismiss "mixed petitions" — those with exhausted and unexhausted claims — and that petitioners with such petitions have two options. *See Burton v. Stewart*, 549 U.S. 147, 154, 127 S. Ct. 793, 797 (2007) (citing *Rose*, 455 U.S. at 520-22, 102 S. Ct. at 1204-05). They may: (1) withdraw the mixed petition, exhaust the remaining claims, and return later to district court with a fully exhausted petition; or (2) proceed with only the exhausted claims, although doing so risks subjecting later petitions that raise new claims to "rigorous procedural obstacles." *Id.* (citing *Rose*, 455 U.S. at 520-21, 102 S. Ct. at 1204-05). Davis obviously chose to proceed with the second option, and cannot now avoid the "rigorous procedural obstacles" found in § 2244(b)(2)(B). Indeed, as the Supreme Court has more recently held, "a petitioner with unexhausted claims who chooses . . . to proceed to adjudication of his exhausted claims . . . may [not] later assert that a subsequent petition is not 'second or successive' precisely because his new

19

claims were unexhausted at the time he filed his first petition." *Burton*, 549 U.S.

at 154, 127 S. Ct. at 797.[6]

Moreover, and perhaps even more fundamentally, Davis has failed to

adequately explain why he had not exhausted his state remedies concerning the

*Herrera* claim prior to filing his first federal habeas petition. As he freely admits,

he had the "lion's share" of information he needed to perfect a *Herrera*

freestanding actual innocence claim at the time he filed his first federal habeas

petition. As a result, he could have brought his *Herrera* claim earlier in the state

courts, which would have allowed him to exhaust his claim prior to filing his first

federal habeas petition. In fact, Georgia law expressly provides that he could have

brought an extraordinary motion for a new trial to the Georgia courts at any time.

*See* Ga. Code Ann. §§ 5-5-23, 40, 41 (1997 & Supp. 2008).

---

[6] To the extent Davis suggests the Supreme Court has created an exception to *Rose* in *Panetti v. Quarterman*, 127 S. Ct. 2842 (2007), that exception does not apply here. In *Panetti*, the Supreme Court redefined "second or successive" to exclude an application including a mental incompetency claim, but notably *limited* its holding to incompetency claims because all prisoners are at risk of deteriorations in their mental state, and may not become incompetent until well after their petition is filed. *Panetti*, 551 U. S. at ___, 127 S. Ct. at 2853 ("Congress did not intend the provisions of AEDPA addressing 'second or successive' petitions to govern a filing in the *unusual* posture presented here: a § 2254 application raising a[n] . . . incompetency claim filed as soon as that claim is ripe.") (emphasis added); *see also id.* at ___, 127 S. Ct. at 2866–67 (Thomas, J., dissenting) ("Today's decision thus stands only for the proposition that [mental incompetency] claims somehow deserve a special (and unjustified) exemption from the statute's plain import."). Davis's actual innocence claim, on the other hand, is not the kind of claim that would not ripen until sometime in the future like an incompetency claim.

Finally, even if he had not first brought his *Herrera* claim to the state courts, Davis nonetheless could have gone forward with his *Herrera* claim in his first federal habeas petition by attempting to overcome his procedural default with a showing of "cause and prejudice" or an "actual miscarriage of justice."[7] *See Freeman v. Att'y Gen.*, 536 F.3d 1225, 1231 (11th Cir. 2008) ("When a state prisoner fails to exhaust his federal claims in state court pursuant to independent and adequate state procedural rules before bringing his habeas petition, 'federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'"), *cert. denied*, ___ U. S. ___, 129 S. Ct. 921, ___ (2009). Yet, for reasons he does not provide — and which his counsel has suggested were purely tactical[8] — he failed to pursue either option.

---

[7] We assume, without deciding, that an unexhausted *Herrera* claim is subject to the procedural default rules, which allow for a federal court to hear an unexhausted claim if the petitioner has shown "cause and prejudice" or an "actual miscarriage of justice." *See Mize v. Hall*, 532 F.3d 1184, 1195 n.9 (11th Cir. 2008) (stating in dicta that "if a petitioner in fact has a freestanding actual innocence claim, he would be entitled to have all his procedural defaults excused as a matter of course under the fundamental miscarriage of justice exception"); *see also Brown v. Hooks*, 176 F. Appx. 949, 954–55 (11th Cir. 2006) (unpublished) (vacating the district court's decision dismissing a petition with prejudice so that the district court could determine whether either of the two "narrow circumstances" could apply to excuse the procedural default of the petitioner's unexhausted actual-innocence claim based on a newly discovered affidavit).

[8] Davis also has argued that he could not have brought his *Herrera* claim until he sought relief from Georgia's State Board of Pardons and Paroles, relying on language in *Herrera* that a

21

Because Davis did not bring his *Herrera* claim during his first federal habeas petition, and cannot excuse his failure to do so on exhaustion grounds, Davis is left with relying on any evidence in support of his *Herrera* claim that "could not have been discovered previously through the exercise of due diligence." 28 U.S.C. § 2244(b)(2)(B)(i). Davis concedes that of the 27 exhibits in support of his *Herrera* claim that he submitted along with his application to file a second or successive habeas petition, only one satisfies this procedural requirement: a September 2008 affidavit of trial witness Benjamin Gordon.[9]

We agree that the 2008 Gordon affidavit, and only this affidavit, satisfies the requirement of due diligence embodied in § 2244(b)(2)(B)(i). Gordon was a witness at Davis's trial, and his story has changed markedly since that time. In his initial police statement, Gordon discussed a shooting at a party that took place in

freestanding actual innocence claim may be viable only "if there were no state avenue open to process such a claim." 506 U.S. at 417, 113 S. Ct. at 869. However, a person seeking to establish his innocence of a crime under Georgia law may apply for a pardon "any time after conviction," State Board of Pardons and Paroles Rule 475-3-.10(3)(a) (2007), signifying that Davis could have exhausted this state avenue before he filed his first federal habeas petition.

[9] The other affidavits are these: Gary Hargrove – 8/17/01; Joseph Washington – 12/5/96; Harriet Murray – 10/14/02; Anthony Hargrove – 8/20/01; Shirley Riley – 8/18/01; Darold Taylor – 8/20/01; Tonya Johnson – 12/6/96; Anita Dunham Saddler – 7/10/02; April Hester Hutchinson – 7/2/02; Peggie Grant – 7/11/02; Daniel Kinsman – 10/15/02; Kevin McQueen – 12/5/96; Jeffrey Sapp – 2/9/03; Monty Holmes – 8/17/01; Darrell "D.D." Collins – 7/11/02; Larry Young – 10/11/02; Dorothy Ferrell – 11/29/00; Antoine Williams – 10/12/02; April Hester Hutchinson –11/30/95; Abdus-Salam Karim – 10/8/02; Robert Grizzard – 3/23/03; Benjamin Gordon – 2/10/03; Michael Cooper – 2/10/03; Joseph "Papa" Blige – 12/1/95; Lamar Brown – 11/2/95; and Professor Jeffrey S. Neuschatz – 7/6/07.

22

Cloverdale immediately prior to Officer MacPhail's shooting, and said that the shooter at the Cloverdale party was wearing a white Batman shirt, white Nike shoes, and jeans, and was mad because Gordon and his friends were at the party. The State introduced evidence at trial suggesting that the shooters at both locations were the same person, and called Benjamin Gordon to testify.

At trial, Gordon testified that he did not see the shooter at the Cloverdale party and that he did not remember telling the police any of the details about the shooter. In a 2003 affidavit, Gordon said that Davis had not been among the group of people at the Cloverdale party, reiterated that he had not seen the shooter, and said that the police had threatened him, so he had signed the police report without reading it. In his 2008 affidavit, Gordon said that he had possessed additional information in 2003, but had not shared it because it involved a family member, Red Coles, and Gordon was worried about getting in trouble with the police. Gordon reaffirmed the contents of his earlier affidavit, but added that Coles had suggested to him, long after the shooting, that he (Coles) was the one who had killed Officer MacPhail.

There is nothing to indicate that Davis could have previously discovered this information with the exercise of due diligence. In fact, because Gordon previously executed an affidavit that was favorable to Davis, there was no reason

23

for Davis to believe that Gordon had omitted any information. As a result, we consider the 2008 Gordon affidavit in determining whether Davis has satisfied § 2244(b)(2)(B)(ii).

B. *28 U.S.C. § 2244(b)(2)(B)(ii)*

We turn then to the second requirement necessary to file a successive petition under AEDPA, embodied in § 2244(b)(2)(B)(ii), and conclude that Davis cannot satisfy § 2244(b)(2)(B)(ii) for two independent reasons.

First, in analyzing this requirement, we consider whether a *Herrera* freestanding actual innocence claim is the kind of claim that can be heard in a *second or successive* habeas petition. We begin, as we must, with the plain language of the statute. As we have often said, "[t]he starting point for all statutory interpretation is the language of the statute itself." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999). Indeed, "[t]he first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute. If the statute's meaning is plain and unambiguous, there is no need for further inquiry." *United States v. Silva*, 443 F.3d 795, 797–98 (11th Cir. 2006) (quotation marks omitted) (quoting *United States v. Fisher*, 289 F.3d 1329, 1337–38 (11th Cir. 2002)). We "assume that Congress used the words in a statute as they are commonly and

24

ordinarily understood, and we read the statute to give full effect to each of its provisions." *DBB, Inc.*, 180 F.3d at 1281. Put differently, we "must presume that Congress said what it meant and meant what it said." *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1167 (11th Cir. 2003) (quotation marks omitted).

Section 2244(b)(2)(B)(ii) provides that new evidence submitted with an application to file a second or successive petition must "be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). Under the plain language of the statute, § 2244(b)(2)(B)(ii) requires *both* clear and convincing evidence of actual innocence — "clear and convincing evidence that . . . no reasonable factfinder would have found the applicant guilty of the underlying offense" — *as well as* another constitutional violation — "but for constitutional error." It is, in effect, an "actual innocence plus" standard. The statutory language makes perfect sense in the context of a typical constitutional claim, such as one arising under *Brady*, *Giglio*, or *Strickland*, or where some other constitutional violation being complained of is not based upon the guilt or innocence of the petitioner.

However, the statutory language does not readily accommodate Davis's freestanding *Herrera* claim. In fact, in order to apply the statute to his claim, §

2244(b)(2)(B)(ii) would have to be read to say that the new evidence must "be sufficient to establish by clear and convincing evidence that, but for *the fact that the applicant was actually innocent*, no reasonable factfinder would have found the applicant guilty of the underlying offense." This reading would render the "but for constitutional error" language entirely superfluous, requiring a petitioner only to show "clear and convincing evidence" of actual innocence in order to satisfy the second prong of the statute. It is, of course, inconceivable that a person would be found not guilty "but for" — or "except for" — his actual innocence; rather, a person is found not guilty precisely because of his actual innocence. We cannot read statutory language in a way that renders it wholly meaningless or nonsensical. While "[this] modification may be an appealing improvement in [Davis's] eyes, . . . we are not licensed to practice statutory remodeling." *United States v. Griffith*, 455 F.3d 1339, 1344 (11th Cir. 2006). "Our function is to apply statutes, to carry out the expression of the legislative will that is embodied in them, not to 'improve' statutes by altering them." *Wright v. Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1255 (11th Cir. 2002). The statute undeniably requires a petitioner seeking leave to file a second or successive petition to establish actual innocence by clear and convincing evidence *and* another constitutional violation.

26

Simply put, Davis has not met the statute's procedural requirements for leave to file a second or successive petition.

But even if we were to completely read out of the statute the phrase "but for constitutional error" and assume *arguendo* that a *Herrera* claim, without more, is the kind of constitutional error contemplated by § 2244(b)(2)(B)(ii), the Gordon affidavit is plainly insufficient to establish a prima facie showing that, but for this evidence, no reasonable factfinder would have found Davis guilty of the underlying offense. According to Gordon's 2008 affidavit, in 1995 or 1996, Red Coles told Gordon that "he [(Coles)] shouldn't have done that" when they were talking about the officer shooting. Gordon told Coles to clear it up because they had someone locked up for the murder, and Coles cried. This affidavit is murky; it does not unambiguously establish that Coles confessed to the murder.

But, more important, the affidavit, standing alone, does not negate the rest of the State's evidence at trial. The prosecutor's case included the presentation of four eyewitnesses to the officer's shooting who unambiguously identified Davis as the shooter. Further, the State's evidence showed that Davis was the one to strike Larry Young, a homeless man who, according to the evidence, was hit in the head by the same person who shot Officer MacPhail. The prosecution also established that Davis confessed to the murder to Jeffrey Sapp and Kevin McQueen. Because

27

this evidence remains in place, Gordon's affidavit does not overwhelmingly bolster the credibility of Davis's witnesses — including Joseph Washington, who said at trial that he saw Coles shoot the officer, and Tanya Johnson, who said at trial that Coles looked nervous after the shooting — to the point where no reasonable factfinder would have credited the State's witnesses.

In short, we are constrained by the statutory requirements found in § 2244(b)(2)(B) to conclude that Davis has not even come close to making a prima facie showing that his *Herrera* claim relies on facts (i) that could not have been discovered previously through the exercise of due diligence, *and* (ii) that, if proven, would "establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B). He, therefore, cannot file a successive petition.

C. *Equitable grounds*

Davis suggests, however, that we are not bound by the procedural requirements placed on us by Congress in § 2244(b)(2)(B), and that we may grant him permission to file his *Herrera* claim in a successive petition, on equitable grounds. This argument, it seems, is based on Davis's assumption that we are his

28

last resort, that no other court or legal body can hear his claim of innocence.  We remain unpersuaded.

As an initial matter, Davis has cited no case authority for the notion that we can ignore the gatekeeping requirements found in § 2244(b)(2)(B), and we have been unable to find any.  On the contrary, when the Supreme Court reviewed the constitutionality of this precise statutory provision in *Felker*, it observed that "the new restrictions on successive petitions [derive from] . . . a complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions."  518 U.S. at 664, 116 S. Ct. at 2340 (quotation marks omitted).  It concluded that "[t]he added restrictions which the Act places on second habeas petitions are well within the compass of [the writ of habeas corpus's] evolutionary process . . . ."  *Id.*  In other words, habeas corpus is, at its core, an equitable remedy, and § 2244(b)(2)(B) is Congress's codification of an equitable standard.  Neither Congress nor the courts ever have hinted that an *additional* equitable exception to § 2244(b)'s general ban on second or successive federal habeas petitions exists.  As a panel of this Court has observed, "[w]e have neither the power nor the inclination to turn back the clock and pretend that the AEDPA was not enacted.  It was enacted, and its provisions govern second or successive petitions." *Jordan*, 485 F.3d at 1359 (citation omitted).

But even if we could somehow employ our equitable powers as gatekeeper reviewing a successive petition and ignore the plain requirements found in § 2244(b)(2)(B), Davis has not presented us with a showing of innocence so compelling that we would be obliged to act today.  Rather, the record, including all of the post-trial affidavits, is, at best, tortured and difficult. Indeed, the Georgia trial court and Georgia's supreme court have twice parsed through all of this evidence and determined that it was insufficient to establish Davis's innocence.  In addition, Georgia's State Board of Pardons and Paroles held a hearing, questioning every witness Davis's attorneys presented to support their allegation that there was doubt as to Davis's guilt; studied the voluminous trial transcript, the police investigation report, and the initial statements of all the witnesses; had certain physical evidence retested and Davis interviewed; and ultimately concluded that clemency was not warranted.

Our review of the record is wholly consonant with the repeated conclusions of the state courts and the State Board of Pardons and Paroles.  For starters, we repeatedly have noted that "recantations are viewed with extreme suspicion by the courts." *United States v. Santiago*, 837 F.2d 1545, 1550 (11th Cir. 1988); *United States v. Smith*, 433 F.2d 149, 150-51 (5th Cir. 1970) (quoting *Newman v. United States*, 238 F.2d 861, 862 n.1 (5th Cir. 1956)).  This makes sense, because as

30

Justice Brennan once explained, recantation testimony "upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." *Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34, 105 S. Ct. 34, 36 (1984) (Brennan, J., dissenting).

We thus approach the recantation affidavits with some skepticism, as we must, and, reviewing the record as a whole, remain unpersuaded. To begin with, four eyewitnesses to Officer MacPhail's murder testified at the trial and identified Davis as the shooter: Steve Sanders, Harriet Murray, Antoine Williams, and Dorothy Ferrell. The first eyewitness, Steve Sanders, an Air Force serviceman, was seated in a van in the parking lot near the site of the shooting. He unambiguously identified Davis as the shooter and did not back off of his identification when he was pressed on cross-examination, testifying that "you don't forget someone that stands over and shoots someone." Sanders has submitted *no* post-trial affidavit altering his eyewitness account.

Another eyewitness, Harriet Murray, was sitting in the parking lot, and was a friend of Larry Young, the homeless man who was struck by Officer MacPhail's shooter. At trial, Murray testified that she had identified Davis from the pictures the police had shown her as the man who "hit Larry and shot the police," and that

31

when she saw Davis's picture she was "real shaked up." Notably, she also identified Davis as the shooter in a courtroom identification. But even if we were to consider Murray's 2002 *unsworn* affidavit, in it she does not back off of her courtroom identification of Davis as being the shooter. It simply adds an inconsistency concerning whether the shooter verbally threatened Larry Young before striking him. And, because her post-trial affidavit is unsworn, like the Supreme Court of Georgia, we are loath to consider it, and afford it precious little weight, if any. *See Davis*, 283 Ga. at 443. In any event, even considering Murray's unsworn affidavit, both Sanders and Murray unambiguously identified Davis as the shooter of Officer MacPhail, and their identifications remain intact.

The two other eyewitnesses, Williams and Ferrell, also identified Davis at trial as having shot and killed Officer MacPhail. According to their post-trial affidavits, they have recanted their identifications, but all that they now declare is that they did not see who the shooter was or what he was wearing. The ambiguity of Williams's and Ferrell's post-trial affidavits falls far short of a compelling showing or, for that matter, a prima facie showing of Davis's innocence.

Davis also points to several post-trial affidavits averring that Red Coles confessed to Officer MacPhail's murder. Yet, at trial, the jury heard Davis and Coles give conflicting testimony: Coles identified Davis as the one who hit Larry

32

Young in the head, and Davis testified that Coles hit Young in the head.  Neither, however, identified the other as the shooter.  The jury chose to believe Coles.  But even if we were to wholly discount Coles's testimony, Davis's trial testimony still squarely conflicts with the testimony of various witnesses, including Sanders, Murray, and even Larry Young, who testified that the only man who spoke that night was the one arguing with him, while Davis testified that he twice told Coles to stop bothering the man. In addition, Davis's testimony also squarely conflicts with the testimony of Red Coles's sister, Valerie Coles, who testified that Davis had come to her house to change shirts after the shooting, while Davis testified that he had never been to her house.

All told, the testimony by Murray and Sanders remains; the two other eyewitnesses do not now implicate anyone, much less Coles; Coles continues to implicate Davis; and the testimony of Larry Young and Valerie Coles still collides with Davis's.  When we view all of this evidence as a whole, we cannot honestly say that Davis can establish by clear and convincing evidence that a jury would not have found him guilty of Officer MacPhail's murder.

We are also unpersuaded by Davis's suggestion that his claim of innocence has not been and will never be heard.  As the record shows, both the state trial court *and* the Supreme Court of Georgia have painstakingly reviewed, and

33

rejected, Davis's claim of innocence. Likewise, Georgia's State Board of Pardons and Paroles thoroughly reviewed, and rejected, his claim, even conducting further research and bringing in witnesses to hear their recantations in person.

Moreover, Davis still may petition the United States Supreme Court to hear his claim under its original jurisdiction. The Supreme Court has made clear that the habeas corpus statute, even after the AEDPA amendments of 1996, continues to allow it to grant a writ of habeas corpus filed pursuant to its original jurisdiction. *See Felker*, 518 U.S. at 660, 116 S. Ct. at 2338; *see also Spivey v. State Bd. of Pardons & Paroles*, 279 F.3d 1301, 1304 n.4 (11th Cir. 2002); *In re Medina*, 109 F.3d 1556, 1564 (11th Cir. 1997), *overruled on other grounds by Stewart v. Martinez-Villareal*, 523 U.S. 637, 118 S. Ct. 1618 (1998). The Supreme Court rested this conclusion — that AEDPA "has not repealed [its] authority to entertain original habeas petitions," — on the fact that "[n]o provision" even "mentions [its] authority to entertain original habeas petitions." *Felder*, 518 U.S. at 660, 116 S. Ct. at 2338.

## III.  CONCLUSION

Since Davis has failed to meet either of the statutory requirements found in AEDPA, 28 U.S.C. § 2244(b)(2)(B), we are constrained to deny him leave to file a second or successive petition. But because Davis still may file a habeas corpus

petition in the Supreme Court, pursuant to its original jurisdiction, we shall

continue the stay of execution for 30 days from the date of the filing of this

opinion.  At the expiration of the 30 day time period, this stay shall be

automatically lifted.

**APPLICATION DENIED.**

BARKETT, Circuit Judge, dissenting:

This case highlights the difficulties in navigating AEDPA's thicket of procedural brambles. While we must deal with the thorny constitutional and statutory questions before us, we also cannot lose sight of the underlying issue in this case. Simply put, the issue is whether Troy Anthony Davis may be lawfully executed when <u>no</u> court has ever conducted a hearing to assess the reliability of the score of affidavits that, if reliable, would satisfy the "threshold showing" for "a truly persuasive demonstration of actual innocence," thus entitling Davis to habeas relief. <u>Herrera v. Collins</u>, 506 U.S. 390, 417 (1993) (quotation omitted).

In the affidavits, seven of nine key trial witnesses recanted their testimony which pointed to Davis as Officer MacPhail's murderer. The two remaining non-recanting witnesses were Sylvester "Red" Coles, who was himself alleged to have been the shooter in affidavits, and Steve Sanders, who identified Davis at trial two years after the incident despite admitting to police immediately following the shooting that he would not be able to recognize the shooter.

The majority of the affidavits support the defense's theory that, after Coles raced to the police station to implicate Davis, the police directed all of their energy towards building a case against Davis, failing to investigate the possibility that Coles himself was the actual murderer. For example, none of the photospreads

36

shown to eyewitnesses even included a picture of Coles. Additionally, three affiants now state that Coles confessed to the killing. To execute Davis, in the face of a significant amount of proffered evidence that may establish his actual innocence, is unconscionable and unconstitutional.

The majority takes the position that we cannot permit Davis to bring his evidence before the district court because our discretion to do so is constrained by AEDPA. But AEDPA cannot possibly be applied when to do so would offend the Constitution and the fundamental concept of justice that an innocent man should not be executed. In this case, the circumstances do not fit neatly into the narrow procedural confines delimited by AEDPA. But it is precisely this type of occasion that warrants judicial intervention. As Justice Fortas noted:

> The scope and flexibility of the writ [of habeas corpus]—its capacity to reach all manner of illegal detention—its ability to cut through barriers of form and procedural mazes—have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.

Harris v. Nelson, 394 U.S. 286, 291 (1969).

## BACKGROUND

The facts of this case center around the night of Friday, August 18 and the early morning of Saturday, August 19, 1989, in Savannah, Georgia. It is

undisputed that "Red" Coles was harassing and following a homeless man, Larry Young, between a pool hall and a Burger King parking lot. Davis and Darrell "D.D." Collins also were present during some portion of the harassment. Someone hit Young, nearby police officer Mark MacPhail responded, and someone shot MacPhail three times.

The police had no leads until Coles went to the police station the day after the murder, admitted that he was one of the three individuals involved in the altercation with Larry Young, and implicated Davis in the MacPhail shooting. There is no dispute that the police focused exclusively on Davis as a suspect because of Coles's statement. The witnesses at trial primarily identified the shooter as the person wearing a white shirt. However, the totality of the evidence, including the affidavits, contains conflicting evidence about what color shirts Davis and Coles were wearing, with testimony that each was wearing a white shirt.

The two trial witnesses who claimed that Davis confessed to the shooting have since recanted in sworn affidavits.[1] Additionally, three witnesses who did not testify at trial have since submitted sworn affidavits stating that Coles confessed to them that he was the shooter, and one of the State's trial witnesses

---

[1] Moreover, one of the two supposed confessions offered at trial was entirely inconsistent with the events of the night in question as reported by all other relevant witnesses, suggesting that little if any credibility should be afforded to that "confession."

submitted a sworn affidavit stating that Coles essentially confessed to him, but that he had not said anything sooner because he and Coles were related. Thus, no one at this time contends that Davis has ever confessed to the shooting; conversely, multiple witnesses maintain that Coles has confessed.

**DISCUSSION**

I.      A Claim of Actual Innocence Is a Cognizable Constitutional Claim.

In Herrera, the Supreme Court assumed, "for the sake of argument . . . , that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." 506 U.S. at 417. Without explicitly announcing a standard by which to judge such a claim, the majority stated that the required threshold showing of innocence "would necessarily be extraordinarily high," in light of the disruptive effect of entertaining such a claim and the enormous burden on a state court of having to retry a case. Id. The majority then held that Herrera's showing of innocence fell short of such a standard. Id. at 418-19.

In a concurring opinion, Justice O'Connor, joined by Justice Kennedy, stated that, regardless of whether one used the "verbal formula" from the Eighth Amendment or Fourteenth Amendment, "the execution of a legally and factually

innocent person would be a constitutionally intolerable event." Id. at 419.

Nonetheless, because the record "overwhelmingly demonstrate[d]" Herrera's guilt, she concurred in the denial of relief. Id. at 421.[2]

Justice Blackmun, joined by Justices Stevens and Souter, dissented from the denial of relief and explained that the majority's discussion of the validity of a freestanding actual innocence claim was dictum because the Supreme Court decided the case based only on the assumption that Herrera's claim was valid. Id. at 430. Justice Blackmun declared that "the Constitution forbids the execution of a person who has been validly convicted and sentenced but who, nonetheless, can prove his innocence with newly discovered evidence." Id. at 431. He explained that the execution of an actually innocent person violated the Constitution's ban on cruel and unusual punishment and its guarantee of substantive due process. Id. at 431-37.

Between Justice O'Connor's concurrence and Justice Blackmun's dissent, five justices agreed that the execution of an actually innocent person would violate the Constitution. Consistent with the opinions of five justices in Herrera, I believe

---

[2] Unlike the record in Herrera, the evidence presented by Davis in support of his actual innocence claim is significant and compelling.

that the Eighth and Fourteenth Amendments prohibit the execution of an actually innocent individual.

With respect to the Eighth Amendment, it is absurd to suggest that executing a person for a crime of which he is innocent does not amount to cruel and unusual punishment. Indeed, the Supreme Court has held that execution violates the Eighth Amendment for several offenses comparatively less severe than murder, including rape. Coker v. Georgia, 433 U.S. 584 (1977). The Court has also held that the execution of mentally retarded persons and juvenile offenders violates the Eighth Amendment because such persons are less criminally culpable. Atkins v. Virginia, 536 U.S. 304 (2002) (mentally retarded persons); Roper v. Simmons, 543 U.S. 551 (2005) (juvenile offenders).

Similarly, the execution of one who is actually innocent, but found legally guilty, clearly runs contrary to social consensus. As Justice Blackmun stated in his Herrera dissent, it is "crystal clear that the execution of an innocent person is at odds with contemporary standards of fairness and decency." 506 U.S. at 431 (quotation omitted). Obviously, the execution of an actually innocent individual has nothing to do with the goals of criminal punishment. Such an execution would serve no retributive purpose nor have any deterrent value. See Kennedy v. Louisiana, 554 U.S. __, 128 S.Ct. 2641, 2661 (2008). On the contrary, the

41

execution of an actually innocent individual undermines the legitimacy of the criminal justice system's power to punish. See Herrera, 506 U.S. at 433-34 (Blackmun, J., dissenting) (noting that "the legitimacy of punishment is inextricably intertwined with guilt").

Likewise, the Fourteenth Amendment's Due Process Clause prohibits states from depriving any person of life or liberty without due process of law. "[S]ubstantive due process prevents the government from engaging in conduct that shocks the conscience, or interferes with rights implicit in the concept of ordered liberty." United States v. Salerno, 481 U.S. 739, 746 (1987) (quotations and citations omitted). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Tinker v. Beasley, 429 F.3d 1324, 1328 (11th Cir. 2005) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)).

Certainly, the execution of an actually innocent person would shock the conscience such that it runs afoul of the right to substantive due process. See Herrera, 506 U.S. at 430 (Blackmun, J., dissenting) ("Nothing could be more contrary to contemporary standards of decency or more shocking to the conscience than to execute a person who is actually innocent.") (internal citations omitted). Justice Blackmun remarked that "[e]xecution of an innocent person is the ultimate

arbitrary imposition" because it is one "from which one never recovers and for which one can never be compensated." Id. at 437 (quotation and citation omitted).

I do not believe that any member of a civilized society could disagree that executing an innocent person would be an atrocious violation of our Constitution and the principles upon which it is based.

II.    As the Constitution Prohibits the Execution of an Actually Innocent Individual, Habeas Relief Must Be Available to an Actually Innocent Individual Facing Execution.

The majority opinion does not consider whether federal habeas relief may ever be available for the actually innocent, but instead concludes that AEDPA prohibits this court from granting permission to file a second or successive habeas petition when the only claim asserted is one of actual innocence. I do not believe that AEDPA's procedural bars should be read to preclude this court from granting permission to file a second or successive habeas petition to individuals who bring a viable freestanding actual innocence claim. As we have recognized, "if a petitioner in fact has a freestanding actual innocence claim, he would be entitled to have all his procedural defaults excused as a matter of course under the fundamental miscarriage of justice exception." Mize v. Hall, 532 F.3d 1184, 1195 n.9 (11th Cir. 2008).

43

In considering § 2244(b)(2)(B)(ii), the majority opinion concludes that a freestanding actual innocence claim is not the type of claim that may be brought on a second or successive petition. Section 2244(b)(2)(B)(ii) requires "clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." The majority opinion decides that this requires that a court of appeals only grant permission to file such a petition when a petitioner can establish both actual innocence and a separate constitutional violation other than the actual innocence. In other words, the "constitutional error" in § 2244(b)(2)(B)(ii) cannot be the actual innocence of the applicant.

However, it is incongruous to suggest that an actually innocent individual who can allege a constitutional violation occurred at trial is entitled to permission to file a second or successive petition, while an actually innocent individual who cannot identify any such violation cannot receive permission from this court to file such a petition to prove his claim, even though granting permission may prevent his unconstitutional execution. Indeed, the underlying principle of a Herrera actual innocence claim is that actual innocence renders an execution "constitutionally intolerable even if [the defendant's] conviction was the product of a fair trial." Schlup v. Delo, 513 U.S. 298, 316 (1995) (quotation omitted). It is

44

the actual innocence of the defendant, not the presence of constitutional errors at trial, that render an execution of an actually innocent individual a violation of the Eighth and Fourteenth Amendments. Accordingly, it should be the actual innocence of the applicant that entitles him to file a second or successive habeas petition.

For the same reason, the failure to satisfy the diligence requirement of 28 U.S.C. § 2244(b)(2)(B)(i) should not be interpreted to bar a viable freestanding actual innocence claim. The concept of punishing an innocent defendant with the penalty of death simply because he did not file his papers as early as he should have is draconian. Moreover, as the majority opinion admits, at least one affidavit, the 2008 Gordon affidavit,[3] does satisfy § 2244(b)(2)(B)(i). However, the majority's analysis of Davis's claim under § 2244(b)(2)(B)(ii) with that affidavit serving as the factual predicate for Davis's claim is flawed.

The majority opinion looks at the Gordon affidavit <u>alone</u> and compares it with the State's evidence at trial, and finds that the affidavit cannot establish that "no reasonable factfinder would have found [Davis] guilty of the underlying

---

[3] Benjamin Gordon's 2008 affidavit implicates Coles as the shooter both through incidents Gordon witnessed on the night of the shooting as well as Gordon's relation of an incident in which Coles essentially confessed to Gordon that he was the one who shot the officer.

offense," as required by § 2244(b)(2)(B)(ii). However, this analysis confuses the "factual predicate" of § 2244(b)(2)(B)(i) with the "facts underlying the claim" in § 2244(b)(2)(B)(ii) by analyzing only the Gordon affidavit, and not the totality of Davis's evidence. While the "factual predicate" for the claim may be Gordon's 2008 affidavit, there is nothing in AEDPA that suggests that this court consider only the "factual predicate" when determining if § 2244(b)(2)(B)(ii) has been satisfied. Instead, the requirement under § 2244(b)(2)(B)(ii) that this court consider the "facts underlying the claim" suggests that we consider all of the relevant facts of Davis's actual innocence claim, which here would include all of the evidence Davis now presents. When considered together, this evidence significantly undermines the evidence presented by the State at trial.

There is no question that, even pre-AEDPA, the procedural obstacles to filing a second or successive habeas petition were considerable. See generally Schlup, 513 U.S. at 317-19. Nonetheless, the Supreme Court has "consistently reaffirmed the existence and importance of the exception for fundamental miscarriages of justice." Id. at 321. And, particularly relevant in the present case, the Court has recognized that "[t]he quintessential miscarriage of justice is the execution of a person who is entirely innocent." Id. at 324-25. Thus, where a defendant who can make a viable claim of actual innocence is facing execution,

46

the fundamental miscarriage of justice exception should apply and AEDPA's procedural bars should not prohibit the filing of a second or successive habeas petition.  I respectfully dissent.