BARKETT, Circuit Judge,
dissenting:
The Supreme Court has said unequivocally that it is a violation of the Eighth Amendment to the U.S. Constitution to execute a mentally retarded person. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Despite the Supreme Court’s command “that such punishment is excessive and that the Constitution ‘places a substantive restriction on the State’s power to take the life’ of a mentally retarded offender,” Atkins, 536 U.S. at 321, 122 S.Ct. 2242 (quoting Ford v. Wainwdght, 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)), the state of Georgia will execute a mentally retarded man when it carries out the execution of Warren Lee Hill.- There is- no question that Georgia will be executing a mentally retarded man because all seven mental health experts who have ever evaluated Hill, both the State’s and Hill’s, now unanimously agree that he is mentally retarded.[1]
*302 The state of Georgia and the majority, however, take the position that a federal court cannot consider Hill’s newly discovered and compelling evidence because Congress’s gatekeeping rules under AED-PA, preclude us from allowing a mentally retarded person to vindicate his constitutional right to never be put to death. The perverse consequence of such an application of AEDPA is that a federal court must acquiesce to, even condone, a state’s insistence on carrying out the unconstitutional execution of a mentally retarded person. When Hill has proffered uncontroverted evidence of his mental retardation, I cannot agree that we have no choice but to execute him anyway because his claim does “not fit neatly into the narrow procedural confines delimited by AEDPA,” In re Davis, 565 F.3d 810, 827 (11th Cir.2009) (Barkett, J., dissenting).
The idea that courts are not permitted to acknowledge that a mistake has been made which would bar an execution is quite incredible for a country that not only prides itself on having the quintessential system of justice but attempts to export it to the world as a model of fairness. Just as we have recognized that a petitioner who “in fact has a freestanding actual innocence claim ... would be entitled to have all his procedural defaults excused as a matter of course under the fundamental miscarriage of justice exception,” Mize v. Hall, 532 F.3d 1184, 1195 n. 9 (11th Cir. 2008), I see no reason not to accord the same consideration to one who has a freestanding claim that he is, in fact and in law, categorically exempt from execution.
I.
The basis for Hill’s present request for relief from his sentence of death is that all three experts who previously testified for the state of Georgia in 2000 that Hill did not meet the criteria for mental retardation have recently come forward and said they made a grievous mistake. They explained that their earlier conclusions were unreliable and that it is now their professional opinion that Hill is mentally retarded. For example, Dr. Thomas H. Sachy, who initiated contact with Hill’s attorney after reading about the then ■ impending execution, said he believed his original “conclusions about Mr. Hill’s mental health status were unreliable because of [his] lack of experience at the time.” Moreover, he noted that he had only spent approximately an hour with Hill the day before the hearing on Hill’s mental status, that he did not have experience evaluating mental retardation, and that Hill’s case constituted one of his first death penalty cases. After reviewing his earlier evaluation and substantial other materials in this case, Dr. Sachy now states:
I believe that my judgment that Mr. Hill did not meet the criteria for mild mental retardation was in error. In my opinion today, within a reasonable degree of scientific certainty, Mr. Hill has significantly subaverage intellectual functioning with an IQ of approximately 70, associat *303 ed with significant deficits in adaptive skills, with onset prior to age 18. I thus concur with the conclusions (rendered previously in Mr. Hill’s case) of Dr. Daniel Grant, Dr. Jethro Toomer, Dr. Donald Stonefeld, and Dr. William Dickinson that Mr. Hill meets the criteria for mild mental retardation and the bases for those conclusions which they articulated.
Dr. Thomas H. Sachy, at ¶6 '(Feb. 8, 2013).[2] Not only did Dr. Sachy conclude that it is his professional opinion now that Hill is mentally retarded, but he also explained why he previously erred in concluding otherwise.
In 2000, my erroneous judgment that Mr. Hill was deliberately feigning a disorder, as well as the narrow scope of information I reviewed, resulted in my error in finding that Mr. Hill was not mentally retarded. However, having learned about and revisited the issues of malingering and mental retardation and having reviewed extensive additional materials from the court record in Mr.' Hill’s case, my conclusion now, to a reasonable degree of scientific certainty, is that Mr. Hill meets the criteria for mild mental retardation as set out in the DSM-IV-TR and as delineated by the American Association on Intellectual and Developmental Disabilities (AAIDD).
Id. at ¶ 18. Dr. Donald W. Harris and Dr. James Gary Carter likewise have attested that their earlier conclusions about Hill were wrong and that they now believe to a reasonable degree of scientific certainty that Hill is mildly mentally retarded. Accordingly, every expert who has ever evaluated Hill for mental retardation believes that he is mentally retarded.
But until Dr. Sachy contacted Hill’s attorneys in July 2012, Hill lacked the factual basis to meet Georgia’s stringent (and, in my opinion; unconstitutional) beyond a reasonable doubt burden of proof for mental retardation. See Hill, 662 F.3d at 1365 (Barkett, -J., dissenting) (“Requiring proof beyond a reasonable doubt, when applied to the highly subjective determination of mental retardation, eviscerates the Eighth Amendment constitutional right of all mentally retarded offenders not to be executed.”). Because some disagreement previously existed among . the seven experts about Hill’s mental retardation, this court held that he could not meet that stringent burden. See id. at 1374-75 (Barkett, J., dissenting) (“Thus, although the state ha-beas court ultimately found that Hill was probably mentally retarded, it was precluded from granting Atkins relief because Georgia limited this constitutionally guaranteed right to only those individuals who could establish mental retardation beyond any reasonable doubt, a standard that cannot be met when experts are able to formulate even the slightest basis for disagreement.”). ‘
Now, given the unanimity of all experts that Hill is mentally retarded, he can prove his mental retardation beyond a reasonable doubt and, thus, conclusively establish that his execution would be unconstitutional, even under Georgia’s unreasonable standard. The majority minimizes the compelling testimony of these three experts as mere recantations, failing to acknowledge the very unusual circumstance of medical professionals unequivocally reversing their prior diagnoses and concluding that to a reasonable degree of medical certainty that Hill is mentally retarded. These experts not only have asserted that their .prior testimony was unreliable but now have affirmatively stated that Hill is mentally retarded. Ünder these extraordinary circumstances, a statute, even if directly applicable, cannot *304 trump the Eighth Amendment’s constitutional mandate.
Hill is within one of three discrete classes of individuals, namely the insane,[3] the mentally retarded,[4] and juvenile offenders,[5] whom the Supreme Court has categorically protected from execution because individuals in these categories inherently lack the degree of culpability necessary to insure that the administration of the death penalty does not violate the prohibition against cruel and unusual punishments under the Eighth Amendment. By categorically exempting these classes of persons from the death penalty, the Supreme Court has “vindieate[d] the underlying principle that the death penalty is reserved for a narrow category of crimes and offenders.” Roper, 543 U.S. at 568-69, 125 S.Ct. .1183 (quoting Atkins, 536 U.S. at 319, 122 S.Ct. 2242). This principle was critical to the Supreme Court’s reauthorization of the death penalty in 1976, at which time -the Court made clear that the death penalty could only be used, without violating the Constitution, if it was reserved for the most atrocious murders committed by the most heinous of murderers so as to protect against its previous arbitrary and disproportionate application.[6] See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). Since that time, the Court has categorically barred the execution of juvenile, mentally retarded, and insane offenders, reiterating that “[c]apital punishment must be limited to those offenders who commit ‘a narrow category of the most serious crimes’ and whose extreme culpability makes them ‘the most deserving of execution.’ ” Roper, 543 U.S. at 568, 125 S.Ct. 1183 (emphasis added)(quotation marks omitted). The Court held that it would violate the Eighth Amendment to execute offenders within these three classes, “no matter how heinous the crime,” id., and thus did not leave it to judges or juries to decide what weight to give to an offender’s youth, mental retardation, or insanity. These categorical bars “vindicate the underlying principle that the death penalty is reserved for a narrow category of crimes and offenders.” Id. at 568-69, 125 S.Ct. 1183.
Accordingly, I cannot see how any procedural hurdle, even AEDPA’s bars to filing a second or successive habeas application, can be constitutionally enforced when *305 doing so will eviscerate the constitutionally-protected right that a juvenile, mentally retarded, or insane offender has not to be executed. Cf. In re Webster, 605 F.3d 256, 260 (5th Cir.2010) (Wiener, J., concurring) (“I continue to harbor a deep and unsettling conviction that, albeit under Congress’s instruction which ties our judicial hands so illogically, we ' today have no choice but to condone just such an unconstitutional punishment.”).
II.
The majority believes that we cannot grant permission for a federal court to hear Hill’s present application because he cannot satisfy the procedural hurdles of 28 U.S.C. § 2244(b)(2)(B)(ii), which govern when a “second or successive” habeas petition can be heard. I do not quarrel with whether Hill’s claim fits within the requirements of this statutory provision because, as I see it, and as explained above, Congress cannot have intended to preclude federal habeas relief for an individual who is constitutionally ineligible for execution.[7] Claims of freestanding actual innocence of the underlying offense and categorical ineligibility for the death penalty, as here in Hill’s case, “do not fit neatly into the narrow procedural confines delimited by AEDPA.” In re' Davis, 565 F.3d at 827 (Barkett, J., dissenting). Such claims cannot be ' subject to AEDPA’s restrictions when doing so will ensure that the U.S. Constitution is violated. See, e.g., Herrera v. Collins, 506 U.S. 390, 402, 113 S.Ct. 853, 122. L.Ed.2d 203 (1993) (“[Federal habeas courts act in their historic capacity — 'to' assure that the habeas petitioner is not being held in violation of his or her federal constitutional rights.”).
Indeed, the Supreme Court has not always adhered to a strict construction of 28 U.S.C. § 2244, particularly when determining whether a claim is subject to the restrictions on filing a “second or successive” *306 habeas petition. In Stewart v. Martinez-Villareal, 523 U.S. 637, 645, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998), the Court concluded that the restrictions on second or successive applications for federal habeas relief would not preclude a federal court from hearing a petitioner’s Ford claim that he was categorically exempt from execution because of insanity. At the time the state issued a warrant for his execution, Martinez-Villareal sought federal habeas relief on his Ford claim. Martinez-Villareal, 523 U.S. at 640, 118 S.Ct. 1618. Even though the Court acknowledged that this was the second time the petitioner had asked for relief pursuant to Ford, it did not treat the present claim as a second application for relief even though his Ford claim had previously been dismissed as premature. Id. The Court instead concluded that because the Ford claim was now ripe for adjudication, there had only been one application for relief and 28 U.S.C. § 2244(b) did not bar review of the claim. Id.
Subsequently, in Panetti v. Quarterman, 551 U.S. 930, 945, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007), the Court addressed the related question of whether a Ford claim raised for the first time in a petition, after a petitioner’s other federal habeas claims had already been rejected in an earlier petition, should be treated as a second or successive application. As it did in Martinez-Villareal, the Court explained that “the implications for habeas practice would be far reaching and seemingly perverse” were it to strictly construe the meaning of “second or successive” under these circumstances. Id. at 943, 127 S.Ct. 2842 (citing to Martinez-Villareal, 523 U.S. at 644, 118 S.Ct. 1618). Accordingly, the Court concluded “that Congress did not intend the provisions of AEDPA addressing ‘second or successive’ petitions to govern a filing in the unusual posture presented here: a § 2254 application raising a Ford-based incompetency claim filed as soon as that claim is ripe.” Id. at 945, 127 S.Ct. 2842.
Simply put, the Supreme Court has recognized that “[t]here are, however, exceptions” to AEDPA’s “second or successive” bar to the filing of a federal habeas petition second in time. Id. at 947, 127 S.Ct. 2842. In the cases of Martinez-Villareal and Panetti, the Court was unwilling to construe AEDPA “in a manner that would require unripe (and, often, factually unsupported) claims to be raised as a mere formality, to the benefit of no party.” Id.
The Court, likewise, has refused to construe AEDPA in a way that would undermine the “equitable principles [which] have traditionally governed the substantive law of habeas corpus.” Holland v. Florida, — U.S. --, 130 S.Ct. 2549, 2560, 177 L.Ed.2d 130 (2010) (internar citation and quotation marks omitted). In Holland, the Court specifically rejected the contention that allowing equitable tolling of the one year statute óf limitation for filing a federal habeas petition would undermine one of AEDPA’s “basic purposes” of eliminating delays in the process. Id. at 2562. Instead, the Court reiterated that Congress did not “los[e] sight of the fact that the ‘writ of habeas corpus plays a vital role in protecting constitutional rights.’ ” Id. (quoting Slack v. McDaniel, 529 U.S. 473, 483, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)).
[Congress] did not seek to end every possible delay at all costs. The importance of the Great Writ, the only writ explicitly protected by the Constitution, Art. I, § 9, cl. 2, along with congressional efforts to harmonize the new statute with prior law, counsels hesitancy before interpreting AEDPA’s statutory silence as indicating a congressional intent to close courthouse doors that a strong eq *307 uitable claim would ordinarily keep open.

Id.

Contrary to the State and the majority’s view that Hill’s claim cannot be heard because the statute only addresses guilt of the “underlying offense,” I do not believe that we must “interpret ] AEDPA’s statutory silence” regarding claims that an offender is categorically barred from receiving a sentence of death “as indicating a congressional intent to close courthouse doors that a strong equitable claim would ordinarily keep open.” Holland, 130 S.Ct. at 2562. Indeed, although Ford’s ban on the execution of the insane pre-dates AEDPA’s enactment, it is telling that the Supreme Court has not construed AEDPA to bar a petitioner from raising a Ford claim in what would otherwise be considered a second or successive habeas petition. See Martinez-Villareal, 523 U.S.' at 643, 118 S.Ct. 1618; Panetti, 551 U.S. at 945, 127 S.Ct. 2842. Likewise, it simply cannot be that Congress would have intended AEDPA to preclude a federal court from hearing the claim of a juvenile or mentally retarded offender who obtains, albeit after the conclusion of his prior federal habeas proceedings, irrefutable proof that his status constitutionally bars his execution forever.
Just as the Court was able to reconcile AEDPA’s finality concerns with habeas’s equitable principles in the context of a Ford claim, AEDPA’s requirements should not be construed to require the unconstitutional execution of a mentally retarded offender who, by presenting evidence that virtually guarantees that he can establish his mental retardation, is able to satisfy even the preposterous burden of proof Georgia demands. If the Supreme Court means that the mentally retarded cannot be constitutionally executed, and Hill has now shown beyond any reasonable doubt that he is' mentally retarded, a congressional act cannot be applied to trump Hill’s constitutional right not to be executed.[8]
*308 APPENDIX A
Case l:04-cv-00151-WLS Document 2 Filed 10/05/04 Page 2 of 110
TABLE OF CONTENTS
PROCEDURAL HISTORY.3
INTRODUCTION.5
CLAIMS ENTITLING PETITIONER TO RELIEF.10
CLAIM ONE MR. HILL IS MENTALLY RETARDED, AND HIS EXECUTION WOULD VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
A. Warren Lee Hill is Mentally Retarded.12
1. Mr. Hill Has Significantly Subaveraae Intellectual Functioning . 13
2. Mr. Hill Has Significant Limitations in Adaptive Functioning . 15
B. Mr. Hill's Case Illustrate? the Risk that the Death Penalty in Georgia Will Be Imposed in Spite of Factors Which May Call for a Less Severe Penalty. .19
C. Georgia's "Beyond a Reasonable Doubt" Standard of Proof for Mental Retardation Claims Violates the Eighth and Fourteenth Amendments.' ... 25
1. The "beyond a reasonable doubt" standard violates the Fourteenth Amendment and Cooper v. Oklahoma.26
2. The "bevond-a-reasonable-doubt" standard renders death sentences inherentlv_unreliable in cases where offenders claim they are mentally retarded. 28
D. The "Beyond-a-Reasonable-Doubt" Standard Unfairly Imperils the Lives of Mildly Mentally Retarded Offenders like Warren Hill.30
i
*309 APPPENDIXB
STATE OF GEORGIA
COUN TY OF JONKS
AFFIDAVIT OF THOMAS H. SACHY M.D.. MSc.
Comes now the Affiant, Thomas II. Sachy M.D., MSc., who, after being duly sworn by an officer authorized by law to administer oaths, deposes and slates as follows:
1. My name is Thomas H. Sachy. I am over the age of twenty-one and competent to testify to the truth of the matters set forth in this statement. The opinions I make in this statement are made to a reasonable degree of scientific and psychiatric certainty, based on information experts in my field regularly rely upon.
2. 1 am a medical doctor and a neuropsychiatrist with a private practice at 247 Lana Dr., Gray, Georgia 31032; telephone 478-986-0484. I received my M.D. from the Medical College of Georgia in 1995, completed my residency training in General Psychiatry as well as a fellowship in Behavioral Neurology in 1999 at the Medical University of South Carolina, and I completed a fellowship in Forensic Psychiatry at Emory University in 2000. I am licensed in Georgia and am Board Certified in Psychiatry and Forensic Psychiatry with the American Board of Psychiatry and Neurology. My Curriculum Vitae is attached.
1
*310 3. In 2000, my training had focused primarily on patients with brain injuries and seizure disorders. Most of these patients had Alzheimer’s or other frontal lobe dementia. I had my fellowship in Forensic Psychiatry at Emory University in June 2000 and had taken a half-time position at Central State Hospital in Milledgeville, Georgia, as a forensic psychiatrist. I did not have experience evaluating patients for mental retardation. I had almost no experience testifying in a forensic context.
4. In November 2000,1 was asked to evaluate a death-sentenced prisoner named Warren Lee Hill, Jr., in connection with proceedings to determine whether he was mentally retarded. This was my first experience working on a capital case. 1 ultimately evaluated Hill on December 11, 2000, for approximately one hour and provided my findings to Dr. Gary Carter M.D. and Dr. Donald Harris Ph.D. at Central State Hospital. On December 11, 2000, Dr. Carter assembled a report which included my impressions gleaned from some records pertaining to Hill, and on December 12, 2000,1 produced a separate written report after my evaluation of Mr. Hill the day previously. I testified at the habeas corpus hearing in Hill’s case on or about December 13, 2000. The whole process, including ,my evaluation of Mr. Hill, was rushed due to this compressed timetable.
2
*311 5. In late July 2012,1 noticed media reports about a man whom courts had found to be mildly mentally retarded and who was nevertheless facing execution. I then realized that this man was Warren Lee Hill, and I remembered that I had evaluated him for the government many years ago. Not realizing that a stay of execution had already been entered in the case, I contacted Mr. Hill’s counsel on July 27, 2012, and offered to discuss the case. I told counsel I felt that my previous conclusions about Mr. Hill’s mental health status were unreliable because of my lack of experience at the time, and I wanted to revisit the case. Since that time, at my request, Mr. Hill’s counsel has provided me with my original notes and reports in the case, as well as additional extensive materials from the court record (Butts Co. Superior Court Case No. 94-V-216), much of which I had not reviewed in 2000. These materials include: the entire transcript of the habeas corpus hearing in December 2000, affidavits of teachers, friends, family members, and Navy associates; school and Navy records; reports and affidavits of Drs. Grant, Dickinson, and Stonefeld; examples of letters purportedly written by Mr. Hill while in prison; and a 20 year old memo from social worker Carol Peddy to Mr. Hill’s original trial attorneys. I have also reviewed the United States Supreme Court’s decision in Atkins v. Virginia, 536 U.S. 304 (2002).
3
*312 6. Having reviewed my earlier evaluation results and the far more extensive materials from the record of this case, I believe that my judgment that Mr. Hill did not meet the criteria for mild mental retardation was in error. In my opinion today, within a reasonable degree of scientific certainty, Mr. Hill has significantly subaverage intellectual functioning with an IQ of approximately 70, associated with significant deficits in adaptive skills, with onset prior to age 18. I thus concur with the conclusions (rendered previously in Mr. Hill’s case) of Dr. Daniel Grant, Dr. Jethro Toomer, Dr. Donald Stonefeld, and Dr. William Dickinson that Mr. Hill meets the criteria for mild mental retardation and the bases for those conclusions which they articulated.
7. During my evaluation of Mr. Hill in December 2000, some things in particular persuaded me at the time that, as I wrote in my report of December 12, 2000, he was “malingering a cognitive disorder” and that he did not meet the criteria for mild mental retardation but rather for borderline intellectual functioning. As I noted in my report of December 12, 2000 and in my testimony, Mr. Hill’s repeated response of “I don’t know” to my questions I interpreted as a sign of malingering. Mr. Hill also did not attempt even to guess at answers and often seemed uncooperative generally. He answered many questions conrectly, but also missed or said “I don’t know” to questions I would have thought he would *313 have no trouble answering. I also gave great weight to Mr. Hill’s somewhat poor attempt to copy a drawing of intersecting pentagons as a signal of malingering. I also saw letters Mr. Hill had purportedly written to his counsel which seemed to be more advanced for a mentally retarded person. Finally, I simply found it difficult to believe that someone with mental retardation could function even minimally in the United States Navy as a petty officer, although I have never served in the military.
*312 4
*313 8. Therefore, at the hearing in December 2000,1 was unprepared to find that Mr. Hill met the criteria for mild mental retardation. However, since that time, I have had the opportunity to practice psychiatry for an additional 12 years - almost my entire career as a psychiatrist - and I have treated an extremely wide variety of patients in that time, including many who were mentally retarded. The scientific understanding of mental retardation has also expanded, and the protocols for determining whether a patient is “malingering” or feigning a mental disorder have become more sophisticated, as have the scientific conclusions which can be drawn from such behavior. I have had far more experience with patients who may technically have “malingered” or feigned certain symptoms, but who nevertheless have real mental disorders. In other words, I have vastly greater experience as a *314 psychiatrist than I did in 2000 and I have access to better science pertaining to the key questions in Mr. Hill’s case.
*313 5
*314 9. I do not believe now that Mr. Hill was deliberately feigning a cognitive disorder in 2000, and I believe that his responses to my questions were consistent with mild mental retardation. At the time of the 2000 Central State evaluation, I and the other state clinicians followed the DSM-IV in placing great weight on the medico-legal context of the evaluation as well as on the seeming lack of cooperation of the patient as signs of intentional feigning. In the psychiatric community, we now know that reliance on the DSM criteria has resulted in an extremely high rate of false findings of malingering. See e.g., R. Rogers, Clinical Assessment ofMalingering and Deception, 2nd Ed. (1997); Drob, Meehan and Waxman, Clinical and Conceptual Problems in the Attribution of Malingering in Forensic Evaluations, J Am Acad Psychiatry Law 37:98-106 (2009). False positive findings of malingering have been found to be related to the training that young psychiatrists undergo which places heavy emphasis on ferreting out malingering, leading to its overdiagnosis. I had just emerged from this kind of training when I evaluated Mr. Hill. But, importantly, even where patients do feign (e.g., by being “uncooperative”), this in no way rules out a real underlying disorder. The feigning may even be part of the symptomology of the disorder. Id.
6
*315 10. Based on my experience since then, as well as on science’s current understanding of behaviors once thought to be associated with malingering, it is my opinion that the kinds of behaviors that I perceived during my evaluation - limited or inconsistent memory, lack of cooperation, poor test performance, etc. - were consistent with responses to the stress of the situation typical of someone with an intellectual disability and are even symptomatic of a defense mechanism related to past documented trauma in Mr. Hill’s background. See, e.g., Drob, Meehan and Waxman (2009). These behaviors must also be assessed in the context of the rushed time frame in which my evaluation occurred - literally the day before the December 2000 evidentiary hearing, which was undoubtedly a stressful moment in time for Mr. Hill. I also had only an hour to spend with Mr. Hill.
11. Finally, in the psychiatric community we now understand that access to an expansive fund of collateral information about the patient is essential in order to form an accurate diagnosis of mental functioning and to accurately contextualize a patient’s behaviors which may be superficially consistent with feigning or malingering. See, e.g., Drob, Meehan and Waxman (2009).
12. With this in mind, Mr. Hill’s “I don’t know” response cannot be seen as indicative of malingering in the context of the record in this case. For example, *316 a memo by a defense social worker in approximately 1990-91 (part of Respondent’s Exhibit 53 in the record in Mr. Hill’s case) indicates that even with defense team members prior to his trial, Mr. Hill showed “poor verbal skills and [found] it difficult, almost impossible to express thoughts and feelings. Many questions were answered with ‘I don’t know.’” At the 2000 hearing also, Mr. Ilill was described by his trial level attorneys as being extremely uncommunicative and withholding. I was not privy to this information at the time of my evaluation or testimony. I find the “I don’t know” response to be consistent with mild mental retardation in Mr. Hill and also with schizoid symptoms other clinicians identified. Finally, in light of my experience treating patients since 2000,1 do not today see these kinds of responses as indicative of deliberate feigning.
*315 7
*316 13. With respect to Mr. Hill’s crude drawing of a clock face and somewhat distorted copying of two intersecting pentagons, these too cannot be considered emblematic of deliberate feigning, particularly in light of the fact that Mr. Hill’s hands were cuffed during his attempts to draw them. Furthermore, at the time, I had not reviewed the findings of Dr. Daniel Grant, who had conducted neuropsychological testing in 1997 (part of the court record) and found signs of organic impairment which could have contributed to the less than perfect rendering of the pentagons. (In my testimony in 2000, furthermore, I remarked that there *317 should have been some indication of mental retardation in neuropsychological findings, but since I had not seen Dr. Grant’s findings I did not know that, in fact, there had been findings consistent with mild mental retardation in his neuropsychological testing.) Finally, having treated many hundreds more patients since 2000,1 do not find these drawings to be in any way indicative of intentional feigning.
*316 8
*317 14. With respect to the letters Mr. Hill purportedly wrote to his counsel (see Petitioner’s Exhibit 106 and 110 from the court record), I have been provided with other written correspondence purportedly from Mr. Hill located in his prison file (part of Petitioner’s Exhibit 85 at pp2709, 2712 of the court record) which in my view are clearly in another person’s handwriting, as well as more recent letters purportedly from Mr. Hill which explicitly indicate that they have been written by another inmate. Therefore, I cannot say that the letters I originally examined were actually written by Mr. Hill without assistance from another inmate or counselor. In any event, they cannot provide a basis to rule out mild mental retardation.
15. At the time of the 2000 court hearing, I did not observe the testimony of any other witnesses. I was not privy to the testimony of Navy psychologist Dr. Jerry Brittain and Army psychiatrist Dr. Donald Stonefeld. I was also not privy to the testimony of William Erwin and A1 Grieshaber, Mr. Hill’s original trial *318 attorneys. Mr. Grieshaber is a former military servicemember. I have now had the opportunity to review their testimony. What the testimony of these individuals helps me understand now is that a mildly mentally retarded individual like Mr. Hill could have functioned adequately at least for a time in the structured setting of the Navy at the rank of E5 or petty officer. As the testimony made clear, mild mental retardation would not have prevented Mr. Hill from carrying out his duties as an ordnance loader given the many layers of supervision under which he functioned. As Dr. Brittain describes, Mr. Hill began to decompensate once he transferred from" the Naval Air Station in Boston to NAS Atlanta, where he was given additional responsibilities which he did not have the coping skills to manage. Further, poor interpersonal and relationship skills caused him to be unable to manage stress in his relationship with Myra Wright, his girlfriend in Atlanta. There came a time when Mr. Hill decompensated and had to be brought home to live with relatives. Mr. Hill never lived alone.
*317 9
*318 16. The Navy records, which I had also not seen in 2000, further show that although Mr. Hill was recommended for advancement to the rank of E6, he was passed over for promotion. Thus, there appears to have been recognition, consistent with the affidavits of Mr. Hill’s Navy associates, that Mr. Hill was not able to maintain a level of functioning past a certain point - which is consistent *319 with mild mental retardation. The expanded information pertaining to Mr. Hill’s Navy service persuades me that his service was not inconsistent with mild mental retardation and in fact the trajectory of his performance in the Navy is very consistent with that of a mildly mentally retarded person who encountered stresses with which he was unable to cope.
*318 10
*319 17. Finally, the totality of evidence shows that far from “malingering a cognitive disorder,” Mr. Hill has had a cognitive disorder with adaptive skill deficits since early childhood. He consistently tested in the 2-3 percentile in childhood achievement and intelligence testing, consistent with mild mental retardation. There was no dispute in 2000 among the clinicians who had evaluated Mr. Hill that he has an IQ of approximately 70. There is also evidence of significant deficits in such areas of his functioning as self-care, functional academics, interpersonal skills, and home living since prior to age 18. I concur with Drs. Grant, Slonefeld, Toomer, and Dickinson in this respect. With respect to Mr. Hill’s ability to acquire a driver’s license, drive vehicles, hold a job, or have relationships with women, these are not outside the scope of the abilities of people with mild mental retardation.
18. In 2000, my erroneous judgment that Mr. Hill was deliberately feigning a disorder, as well as the narrow scope of information I reviewed, resulted *320 in my error in finding that Mr. Hill was not mentally retarded. However, having learned about and revisited the issues of malingering and mental retardation and having reviewed extensive additional materials from the court record in Mr. Hill’s case, my conclusion now, to a reasonable degree of scientific certainty, is that Mr. Hill meets the criteria for mild mental retardation as set out in the DSM-IV-TR and as delineated by the American Association on Intellectual and Developmental Disabilities (AAJDD). That is; Mr. Hill has significantly subaverage general intellectual functioning associated with significant'deficits in adaptive functioning, with onset before the age of 18. •
*319 11
*320 [[Image here]]

12

*321 Curriculum Vitae
THOMAS HEWITT SACHY. M.D., iMLSc.
www.gabehaviural.Com
P.O. Box 1726 Gray, Georgia 31032
Email: ppbm@hol3Man.com, Telephone: (478) 986-0484 Fas: (478) 986-0486
CERTIFICATIONS ATTAINED American Board of Psychiatry and Neurology - Psychiatry/ Forensic Psychtaiiy
MEDI CAT, LICENSES Georgia
FEI.LOW.SHIP/POSTCRAPUATB TRAINING
FAIN MANAGEMENT
Responsible Opioid Prescribing; A Physician's Guide 6/19/2010
The University of Wisconsin School of Medicineand Public Health
Advanced Interven líunal Pttirt Management and Injection Therapy of the 1/24/2004 -1/25/2004
Lumbo-Ssml Spine and Extremities
Empire Medical Training. Fort l-ttudcrdale, Florid*
FORENSIC PSYCHIATRY 7/01/19»-«30/2000
Emory University School of Medicine, Dept of Psychiatry, Atilinta, Georgia
BEHAVIORAL NEUROLOGY 7/M/I998-6/30/19»
The Medical University of South Camtina, Dept of Neurology, Charleston, South Carolina
RESIDENCY TRAINING
_______ 7/01/1995-6/30/19»
The Medical University of South Carolina, Dept of Psychiatry, Chatisitton, South Carolina Nattonai Ranking on Senior Year Psyelsifttcy Residency In-Training Examination; Neurology Scots: First Percentile, Psychiatry Score: Fifth Percentile
MEDICAL EDUCATION
DoctorofMedid!» 0/10/1995
The Medical College of Georgia, Augusta, Georgia
Cumulative G.P.A-3.76, Class Rank: 20 ina Class of 191
Recipient: AMA Rock Slcyster Memorial Scholarship
The Medical College of Georgia Scholarship
The Federal Health Professions Sshohuihip
GRADUATE EMiCATION
Mantee of Sdanec In BiotedV 8/27/Í994
Georgia Slate University, Atlanta, Georgia
Cumulative G F.A. -3,8fi
Research Project: A Preliminary Investigation rtf In Vitro Albumin-Mercury Interactions, The Linear H Covalent Band. Advisor: Delon Barfuss, Ph.D.
Recipient: Lifetime Membership - Golden Key National Honor Society
Graduate Research Assistaatship 1990 -1991
Deans List 19S9 -1991
*322 Curriculum Vitae
ONDERGRABIIATE EDUCATION
Bachelor of Science in Electrice 1/Coaimier bnglnccrlng IVWIWW
The University of Calgary. Calgary, Alhena, Canada
Bachelor of Science in Central Studies 31/01/1985
The University of Calgary, Calgary, Alberta, Canuda
Redptenr.Tiw Alexander Rutherford Scholarship 1*381 - 1982,
The Pan-Canadian Petroleum Scholarship 1981 -1982
EXPERIENCE
forensic Pgythfotrv/NcnroBtychletrr 7/15/2001» - Present
LANDMARK CASES*.
Stale of fietmrin vs, Reinaldo Rivera 120041
For the first lime In the State of Georgia, rite finiera e of Positron Emission Totnngt apliy (PtT Scanning] was successfully introduced and accepted as lawful evidence, in a criminal Inal involving the issues of guilt, innocente, and psychopathy.
Statu of South Carolina vs. Stephen Siunfcti 120061
For the first time in the State of South Carolina, ibe science of Positron Emission Tomography JPET Scanning! and Brain MKf Morphological Analysis was successfully introduced and accepted as lawful evident», in it criminal trial involving ihe issues of guilt, innocence, and psychopathy,
‘fnvurte .Smith vv. Stuta of Ceoroia 120081
For the lirat Itnie in the Stale of Orawgbt, a sleepwalking defense wav introduced asa defense in a. criminal trial involving the charge «¡'murder {Slate of Georgia vs. Tavatfe Smith 2O05J, Mr, Smith was stihscrjuendy convicted in that case.
In ZOOS, the Supreme Court of Georgia mminwusty reversed this rvivkiitm Witting; *'We conclude ftar the trial court erred in elnssityMig Smith’s defense as on insanity defense, in informing the jury that It was classifying Smith's defense as an Insanity defense, and in instructing the jury on the defensa of insanity during Its charge. Moreover, we conclude this error was pKjudidaJ to Smith,» Smith's own expert ]Tb<nm Sadry, M.D.] testified that lie did not meet the legal definltiou of Insanity, but that he may have ewnmittud the crime hi question during a period of unconsciousness due to step disorders front which hn was suffering- .For that» reasons, thu trial court's imposition of the insanity defense detected from Smith's primary defense that he did nut commit the nets in question voluntarily and with criminal intent."
Pain MannEOncnt/f finical POTdtiatre/NeuroBsychlatrv
Georgia Pain arid ftehuviuial Medicine: 11/1/2002-Present
Bingnosts and Treatment of Neuropsychlmrio und Chronic Pain Bisoidws Independent Medical Evaluations
Expert Witness - Rain Management
Committee Member - Expert witness - Peer Review Committee: Pain Management Georgia Composite State Board of Medical Examiners
2
*323 Curriculum Vitae
Foremsic Consultation Services
Committee Member - GeotgSs Public Defender Standards Council * Forensic Advisory Committee ~ Mission: To establish expert witness standards for the statewide agency that oversees public defenders in the State of Georgia.
Forensic Psychiatric Evaluation* and ExpertWitness Testimony including eonaultruion for: The US. Department of Justice. The Office of the Attorney General of Geoigto. The Dciadb County Public Defender’s Office, The Fulton County Conflict Defendéis Office, «nd The Bibb County Public Defender's Office, and the Georgia Department of Juvenile Justice.
Artie tunt Professor of Psychiatry and Behavioral Science S/MQWH-6/30/2002
Mercer university School ofMcd'ieine, Maeon, Georgia
Clinical PirwMr.pt Forewfe Services
Central State Hospital, Miliedgcvilie, Georgia 7/15/2000 -7/18/2001
Rcvporwtbiliuca; Administration of Medical Staff Activities, Forensic Services Program Management, inpattcot Forensic Psychiatry Evaluations and Behavioral Neurology Consultations
Foransfe Psychiatry Fellow WU»?-6/30/2000
Emoty Univereity School of Mediente
Staff FcrtraSc Psychiatrist, Psychic try and Daw Service
Responsibilities; Expert witness testiraony - Forensic Psychiatry, Neuropsychiatry. litigation strategy - ease evaluation, expert rebuttal, inpatient and outpatient forensic examinations, with emphasis on competency to stand irinl, criminal responsibility and sentencing evatuacions/racommendations; Independent nredrcai evaluations. (Grady Memorial Hospital, Georgia Regional Hospital-Adanta. Central State Hospital -Milledgsville, Fulton County Jail)
Stuff Psychiatrist, Dekalb County Jail, Correctional Psychiatry
Behavioral Neurology Fellow 7/1/1998-6/30/1599
The Media! University ofSourlt Carolina
Staff Physician, Memory Disorder*) Clinic
Responsibilities: Evaluation and treatment of dementia ami related neurodegenerativo disorders, movement disorders, seizure disorders, sleep disorders mid traumatic brain injury. Inpatient Neurology C'omuUadons (For the MUSC Institute of PsyehiHtry). Forensic Psychiatric and Neurologic Evaluations Capital Crimes
Associate Staff Physician&emdash;Geriatric Psychiatry
(life Care of Charleston, geriatric nursing fStcility)
Resident in Psychiatry 7/1/1995 - 6/30/1999
The Medical University of South Carolina Additional Responsibilities:
Associate Emergency Department Physician
Emergency Medicine. (Charleston Memorial Hospital)
Part Time Designated Medical Examiner
Court Ordered Psychiatric Evaluations. (Cbariertonfflerkcley County Probate Courts)
Staff Psychiatrist
MUSC Emergency Psychiatry Service (MOBILECRISIS) (Berkeley County Mental Health Center Charleston Mental Health Center)
3
*324 Currículum Vitae
Eledriaii/romonter Engineer 9/1/1888-9/15/1989 Amalean TH'nnieal Services, Adama, Georgia Project Engineer - Software Engineer Responsibilities; Design and implementation of engineering so 1 tv, are systems for programmable logic euutrullcra. computer aided design and project billing applications
MEDICAL/LEGAL EIWCATKW PRESENTATIONS
urine Drug Testing fit Psychiatry Millennium I aboratorfex Pact Regional Meeting Atlanta, Georgia 1/21/20(3
Ncurmwvclttatfv and Chronic Pain 12th Annual National Association of Disability Representative» Social Security law Conference New Orleans, laruixiana 4/11/2012
The Ncrorribinlngy of Fibromyalgia Social Security I aw Seminar Institute ot Continuing Regal Education In Georgia State Bar of Georgia Ifcadrputrtm, Atlanta, Georgia 2/16/2012
The NciiruMtilopv of Chronic Pnin Phtu-dera Social Security Disability Law Conference National Organisation of Social Security Claimants’ Representatives San Antonio, Texas imam
The Neuniliittlovv nf Chrnnie Pain Disorders Social Security Law Seminar Instítuteof Continuing Legal Educutfat in Georgia State Bar of Georgia Headquarter;,, Atlanta, Georgia mimn
Ncurn psychiatric roul Developmental Blairtlt-ra in Children District Meeting, Jones County Poster Parent's Society unstww
ffenranavchfatrfe Asurcar of Pain Mannnvment District Meeting, Greater Atlanta Pain Society Atlanta, Georgia wsnm
Neuroscience of Depression nnd Suicide Central Georgia District Meeting, Georgia Dental Association Maeon, Georgia 11/20/2008
Physicians Education Conference Dp.*m Regional Medical Center, Tfaornastou, Georgia 9/25S008
The Science of Eibmmvaluia Central Georgia Pibmtnyuigiu Support Network Coliseum Medical Centers, Macon, Georgia 4/I7/2M8
Forensic Psychiatry »nd the Law Mercer University School of Law, Macon, Georgia 1/51/2008
Forensic Psychiatry and the Law Mercer university School oí law, Macon. Georgia 3/29/2007
4
*325 Curriculum Vitae
AMieirocr’a Disease: Understanding Medication Management 3/8/2007 2007Alzheimer's O.mlcrencc, Central Georgia Alzheimer’s Association Warner Robins, Georgia
Insomnia; New Trente in the Ptorratuologlcal Treatment onnsoximia SmtUM Grand Round'!, Southern Regional Health System Southern Regional Medial Center, RtvcrdaK Ceotgja
Use of AniLKpllentlc Medications In Un- Terelment of Bipolar Disorder 5/18/2006 Psychiatry Residents, The Medical College of Georgia Augusta, Georgia
Steilarithai and tHiTercnce* Among Serotonin fauptake Inhibitors low Cuanlry Pharmacists Assotialiun Charleston, South Carolina 4/18/2006
Forensic Psychiatry and «he bum, Mctecr University School of Law, Mason, Georgia 4/13/2000
Assewancnt and Treatment of Hreahthrouiili Cancer Pain Arden, North Carotin* 3/23/2006
Critical Devtlopineais in Formate Psychiatry Georgia Association of Criminal Defense Lawyers Fall Seminar2005 Brasiiown Vniley Resort, Young Hams, Georgia 11/5/2005
Ríteosle Psychiatry and the taw Mercer Univewity Schooi of Law, Macon, Georg'» 3/smm
Forensic Psychiatry nad illa Law Metecr University Schoul of I-aw, Macon, Georgia 4/22/2004
NeuroadCTceofDenrealun Northeast Alabama Regional Medical Center Anniston, Alabama 3/18/2004
wmam Neonatal - Perinatal Symposium 2003 The Medical Center of Central Georgia, Macan, Georgia
imoorn Neuroscience nfUepressltm Grand Rounds, Department of Psychiatry The Meditad College of (leotgia, Augusta, Georgia
9/11/2003 Neuro-Pavcliiatrir Treatment of Chronic Palm Atlanta Pain Society Atlanta, Georgia
8/5/2003 Nmiro-PsycMatrv of Bipolar Affective Disorder Georgia Society of Health-System Pharmacists Columbus, Geot@a
605/2003 Neuroscience of llenwttila Middle Georgia Assisted Living Coalition Macon, Georgia

s

*326 Curriculum Vitae
Treating Anxiety andltepre-giun to Remission 6/l<t/aXW IK»"’ Annual Convention of the Georgia State Medieal Association Hilton Head Wand, South Carolina
Neurattlenee of Begrossive Disorders _ 5/S/ZCMJ3 Houston County Medical Society Annua) Meeting Dothan* Alabama
Grand Round*, Department of faintly Metltelníí Mct«r university School or Medicine, Matara, Georgia mimi
Netim-RmMnerfc am) Pharmacological Intervention in the Maiuiiteitimt of Depreasion and DUiibliim Pniw 2002 Annual State Board of Workers* Compensation Seminar At!itntfl,tit»jgta wzmmi
Naur n-Psvcliintrv of Bipolar Blwirtler Middle ticorgiuPiyrhoiogical Association Macon, Georgia 1/29/2002
N«iro-lh<yehtatrfc Asnee!» nf Pain 2001 Annual Stale. Board of Workers* Compensation Seminar Atlanta, Georgia mmm
Georgia Landmark Cases- competency to Stand Trial Spring 2000 State Wide Fotensic Psychiatry Service* Meeting Gemgnt Department uflluman Resources, Atlanta, Georgia mmm
Conllrientlalitv ant) the Evaluation; orPangtrotaness PGY-t Psychiatry Residency Clash Fmory University Department of Pryebiauy, Atlanta. Georgia 5/31/201»
The rnsanity Defense and Syndrome Defenses Criminal I aw 525, Winter Semester liroury University School of Law, Atlanta, Gcoigia 3/7/21)00 & 3/21/2001)
Crimina! RwtportsIMiitv taradmark Cans--The insanity Defame Rail 1909 State Wide Forensic Psychiatry Services Meeting Georgia Department efHurmtn Resources, Atlanta, Georgia ttnmm
The KbuiuMoIoby nf Adolescent Violence 10/15/1 WJB Annual Meeting of the American Academy of Psychiatry ami the Law, Panel Presentation of the Child and Adolescent Foreosk Psychiatry Committee Baltimore, Maryland
't he Neurology of Psychopathy 4Í8Í1999 Grand Rounds, Department of Neurology The Medical University of South Carolina, Charleston, South Carolina
*fhe Ncnrnpsvrtuatry of Vlolent/frimlnal Behavior 5/6/i 90S Vsychopbuimscology Case Confeiencu, Department of Psychiatry The Medieal University of South Carolina, Charleston, South Carotina
£
*327 Curriculum Vitae
MEMBERSHIP!}
American Medical Association
Pain Relief N'-clv-’uik
«PSBARCH
Coitaburatine Physician Investigator: DSM-5 FieW Trials 6/29S011-1/1/2012
Co-Invertígatur: “Double-Blind Evaluation of Risperidone vs. Halopeiidai In the tons Term Morbidity of Early Psychotic Patients," With Samuel Craig Risch M.D. & Rumen Pharmaceutic», 7/1997 - 7/2003
MANI [.SCRIPT REV 1 EWER
Ttie Jouinnl of Neuropsychiatry ami Clinical ¡tairoselsttees
i’lim.TC ATKINS
“The We of the Party” {fiction), Calgary Mirror, 1980
“üsc of Opioids in Pain Patients with Psychiatric Disorders'’ The Journal of Practical Pain Management. Volume 10, issue 7, September 2010
Guest Author - ’Tales from the Trenches to the War on Pala” 12/1/2011 - Present Pain Treatment Topics (hltpdB’ain-Topics.org)
MEDIA APPEARANCE
9/11/2001; WPGA-TV: 58 ABC NEWS-Macon - World Trade Center Attack
Discussed the psyehtolrte Impact on the nation of the World Trade Center- 9/11 terrorist attacks, on the same day that they oecunud.
2004; Discovery Channel: ExorcMs - The Tree Story
Provided expert commentary regarding the neurological and psychiatric onuses of the demonic possession syndrome. Discussed details of the only documented exoieiuncvct performed In the United States, which subsequently fanned the basis for the novel and the movie, Tita Exorcist.
2005: Discovery Channel; Dally Planet- October 31 2005
Provided expert commentary regarding the neurological imdcrpiituinjs involved in the 1970 exorcism and subsequent death of Aimclicse Michel. This ease served as the basis for the movie. The Exorcism of Emily Rose.
200S: Mil News: MD News - January 2005, Votante 3, Number 11
Cover article describing Dr, Saehy's practice Including his expertise In the field orForensieNetwipsychisuy and its application in the land mart case of the serial killer Reinnltto Rive».
7
*328 CunJcnlnmYitsc
2007; CHS News 48 Hours; Murder On His Mind
“In the summer of2006, in what is known as low country South Carolina just north of Charleston, forachange it wasn't the heat everyone was talking about- it was the havoc one man wreaked on this small coastal community. As correspondent Troy Roberts reports, Stephen Stanko faced a six-count indictment, including murder anti kidnapping. It wus thr county's Curt death penalty casa in nearly a tfecade and Stanko stood accused of committing some of the most heinous and brutal crimen in Georgetown in recent rnomoty. Defense expert Dr, Thomas Saehy explains the science behind the argument that u hrain defect led Stephen Stanko to become violent"
2010: SyFy Channel The Haunted Boy
“A new paranormal dtxttitiKniitty film from The Booth Brothers, (Spooked, Children of the Grave, The Possessed, Death Tunnei as seen onSyhy, NBC Universa!, Sony Pictures). While (timing n haunted asylum in St. Louis, Missouri, documentary filmmakers uncover a secret diary of the infamous 1949 exorcism involvings 13ycaroldboy possessed by the devil that later inspired the book sod movie “The Exorcist", Utilizing hi-tech paranormal gadgelty along with u legion of supernatural experts they search out to capture the scariest entity known to man, "The Unholy Ghost", Nothing you have ever seen or heard before gets yon closer to the ungodly tiuth of what really happened in this most terrifying, heal selling story of all time! This is the untold-real stoty of "The Exorcist”, a chronicle of nueevents based on (he actual pricsft secret diary the world was not to see, Until Now!"
a

. I have attached a copy of Dr. Sachy's affidavit as "Appendix B.”

. Ford, 477 U.S. at 405, 106 S.Ct. 2595.

. Atkins, 536 U.S. at 321, 122 S.Ct. 2242.

. Roper v. Simmons, 543.U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

. When the Supreme Court four years earlier halted the use of the death penalty, several of the Court’s justices expressed concern that the unfettered discretion judges or juries had in imposing capital punishment disproportionately resulted in the poor, sick, uneducated and unpopular members of society being sentenced to death. See Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). As Justice Marshall pointed out in his concurring opinion in Furman:
It is the poor, and the members of minority groups who are least able to voice their complaints against capital punishment. Their impotence leaves them victims of a sanction that the wealthier, better-represented, just-as-guilty person can escape. So long as the capital sanction is used only against the forlorn, easily forgotten members of society, legislators are content to maintain the status quo, because change would draw attention to the problem and concern might develop. Ignorance is perpetuated and apathy soon becomes its mate, and we have today’s situation.
Id. at 366, 92 S.Ct. 2726 (Marshall, J., concurring).

. However, I disagree with the majority’s position that Hill’s present claim, that his execution would be in violation of the Eighth Amendment because he can establish the fact of his mental retardation beyond a reasonable doubt, would be barred under 28. U.S.C. § 2244(b)(1).. This provision requires a federal court to dismiss “[a] claim presented in a second or successive habeas corpus application ... that was presented in a prior application!.]” As the majority sees it, Hill previously raised the claim that he could establish the fact of his mental retardation beyond a reasonable doubt, but the majority’s position is based on reading legal arguments into the factual assertions that Hill presented in his first federal habeas petition.'
Hill argued in his prior federal habeas petition that his execution would violate the Eighth Amendment, not because he could establish the fact of his mental retardation beyond a reasonable doubt, but because Georgia’s legal standard of proof of beyond a reasonable doubt was contrary to or an unreasonable application of Atkins where the state habeas court had found him to be mentally retarded by a preponderance of the evidence. When his prior federal petition is considered in its entirety it is clear that Hill’s argument was limited to a challenge to Georgia's insuperably high burden of proof for mental retardation. This court's (now-vacated) panel opinion also confirms that the only claim before this Court was the purely legal claim of whether Georgia’s standard of proof was an unreasonable application of or contrary to Atkins. Our en banc decision addressed the same question.
While it is true that Hill has consistently asserted the fact that he is mentally retarded, nowhere in his prior federal habeas petition, our original panel decision, nor our en baric decision, was the question raised or answered of whether Hill had established his mental retardation beyond a reasonable doubt. See Hill, 662 F.3d at 1362 (Tjoflat, J., concurring) (“Hill's real complaint is not that he is mentally retarded, and that the state post-convic,tion c.ourt’s contrary conclusion was erroneous. Hill instead argues that the state post- ' conviction proceeding utilized' an unfair procedure for determining whether he is mentally retarded.”)

. Although, as the majority notes, notwithstanding this court’s denial of his application, Hill still may petition the Supreme Court for a writ of habeas corpus under its original jurisdiction, see Maj. Op. at 301 n. 20 (citing Felker v. Turpin, 518 U.S. 651, 661-63, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996)); see also In re Davis, 565 F.3d at 826-27. Nonetheless, the potential availability of this alternative avenue for relief does not, as I see it, mean that federal courts do not have the authority or responsibility to enforce the constitutional mandates of the Supreme Court through the equitable remedy of habeas.